569 A.2d 1288

**The BOARD OF EDUCATION OF CHARLES COUNTY, Maryland,**

v.

**PLYMOUTH RUBBER COMPANY, et al.**

**PLYMOUTH RUBBER COMPANY**

v.

**The BOARD OF EDUCATION OF CHARLES COUNTY, Maryland, et al.**

**No. 660, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Feb. 28, 1990.

**10**

12

Jack L. Harvey, Wharton, Levin & Ehrmantraut, Annapolis, and Edward S. Digges, Sr., LaPlata, on the brief, for appellant/appellee/cross-appellant, Bd. of Educ.

Stephen H. Ring, Rockville, for Plymouth Rubber Co.

James G. Healy (Anderson and Quinn, on the brief), Rockville, for appellee, J.B. Eurell Co.

William N. Zifchak (Sasscer, Clagett, Channing & Bucher on the brief), Upper Marlboro, for appellee, J.B. Eurell Co., Inc.

Richard R. Page Wyrough and Farrington, Smallwood & Wells on the brief, Landover, for appellee, The Davis Corp.

Argued before MOYLAN, BISHOP and ALPERT, JJ.

ALPERT, Judge.

This case is about a roof that just wouldn't stop leaking. We are presented with an appeal from judgments entered in two separate actions, Civil Action Nos. 85–895 and 86–1428, which were consolidated and tried together before a jury.

Appellant, the Board of Education of Charles County ("The Board"), was the plaintiff. The Davis Corporation ("Davis"), J.B. Eurell Company, Inc. ("Eurell"), Plymouth Rubber Company ("Plymouth"), and Mark Beck Associates, Inc. ("Beck") were defendants. Various cross-claims and third-party actions were asserted amongst the parties defendant.

After a prolonged trial, the jury, by answers to a jury verdict sheet, returned a verdict in favor of appellant for $633,145 against appellee Plymouth and a defendant's verdict for appellee Davis. The jury did not award Plymouth a recovery on its cross-claim against Eurell. Beck was dismissed without opposition prior to submission of the case to the jury. At the beginning of the trial, the court had dismissed the Board's claims against Eurell.

This action commenced over four years ago on August 5, 1985, when the Board, as owner, sued Davis, the general contractor, for installing a defective roof supplied under a construction contract for the alteration and renovation of what is now known as the Milton M. Somers Middle School ("the School") in LaPlata, Maryland. This was Civil Action No. 85–895. Davis subsequently filed a third party complaint against Beck, as the architect/engineer; Eurell, as the subcontractor who installed the roof; and Plymouth, as the supplier of the roofing system.

Approximately a year later, in August of 1986, Davis filed a motion for summary judgment contending that the Board's action against it was barred by limitations. The motion was granted in October of 1986 and the action was dismissed. An appeal followed. In June of 1987, this court vacated the judgment and remanded the case to the trial court. *The Board of Educ. of Charles County v. The Davis Corporation,* No. 1512, September Term, 1986 (opinion filed June 1, 1987). The Court of Appeals had previously denied Davis's Petition for Writ of Certiorari while the case was pending before this court. *Board of Educ. of Charles County v. Davis Corp.,* 308 Md. 270, 518 A.2d 732 (1987).

Shortly after the dismissal of Civil Action No. 85–895, the Board instituted Civil Action No. 86–1428, which asserted various claims separately against Plymouth, Eurell, and Beck for recovery of damages caused by installation of the defective roof at the School.

A joint motion for summary judgment was filed in Civil Action 86–1428 by Davis, Plymouth, and Eurell on January 28, 1987, asking the court to dismiss pursuant to Maryland Rule 2–332 because these three parties were third-party defendants in 85–895 who had not been named as defendants by the Board. This motion was denied by an order dated May 27, 1987. The two cases were then consolidated by an order dated October 7, 1987 for purposes of pre-trial proceedings and trial.

During a pre-trial hearing, the trial court reconsidered and granted the Board's previously denied motion for leave to file an amended complaint, and continued the trial at the request of Eurell. A new trial date was set for September 19, 1988.

The consolidated proceedings finally proceeded to trial on September 21, 1988. Prior to any testimony in the case, however, the court granted Eurell's oral motion *in limine* to exclude the deposition testimony of a deceased witness, James Benn. Immediately thereafter, the court dismissed the Board's fraud and civil conspiracy claims against Eurell and Plymouth upon the Board's proffer that without the testimony of James Benn it had insufficient evidence to pursue its fraud and civil conspiracy claims.

Consistent with the jury verdict of October 21, 1988, judgment was entered by docket entries on October 24, 1988 in Civil Action No. 85–895 in favor of Davis and in Civil Action No. 86–1428 for the Board against Plymouth in the amount of $633,145 with interest and costs. The jury found that Plymouth was not entitled to reimbursement in whole or in part from Eurell on Plymouth's cross-claim for indemnification and/or contribution.

Plymouth filed a motion to reform the verdict and revise the judgment and a motion for judgment n.o.v. or, in the alternative, for a new trial. Both motions were denied.

Appeals and cross-appeals followed, resulting in the following designation of the parties. The Board was an appellant with respect to the judgment in favor of Davis in Civil 85–895, having filed a notice of appeal on November 22, 1988. Davis was a cross-appellant with respect to that same judgment in Civil 85–895, having filed a notice of cross-appeal on December 2, 1988.[1]

The Board is an appellant with respect to the judgment in favor of Eurell on the fraud and civil conspiracy counts in Civil 86–1428, having filed a notice of appeal regarding that judgment on January 26, 1989. Plymouth is an appellant with respect to the judgments against it in favor of Eurell (on Plymouth's cross-claim), and a cross-appellant with respect to the Board, having filed its order for appeal on February 16, 1989. The Board is a cross-appellant with respect to the judgment against Plymouth, having filed a notice of cross-appeal on February 24, 1989.

The various appeals and cross-appeals present this court with a host of issues. To settle the rights of the respective parties, we must determine whether the trial court erred:

1. by ruling that the Board could not use the deposition testimony of James Benn in support of its claims against Eurell of fraud and civil conspiracy;

2. in allowing the plaintiff below, the Board, to proceed with a second suit naming as defendants parties who were third-party defendants below;

3. in ruling as a matter of law that the Plymouth warranty was ambiguous and that the term limiting damages applied only to consequential damages;

---

**1.** Shortly before oral argument, we were advised that the Board had settled with Davis and that their respective appeals and cross-appeals would be dismissed. Thus, we need not address the issues raised thereunder.

4. in admitting evidence of the cost of the new roof as a measure of damages;

5. in excluding the Plymouth letter of January 4, 1985, making an offer of settlement;

6. in excluding evidence of the cost of the resident inspector's services and other related expenses; and

7. in failing to reform the verdict or revise the judgment to grant Plymouth's cross-claim against Eurell for contribution.

We hold that the deposition testimony of James Benn was admissible under Maryland Rule 2–419(a)(3)(A). Accordingly, we remand Civil Action No. 86–1428 for a trial on the fraud and civil conspiracy claims asserted against Eurell and Plymouth. We also hold that the trial court erred in ruling as a matter of law that the Plymouth warranty term limiting damages applies only to consequential damages. We believe that, under the circumstances, interpretation of the warranty is a matter for the jury, and we shall therefore vacate the judgment against Plymouth and remand for further proceedings. We affirm the orders and judgment of the lower court as to all other issues.

### *Facts*

This case concerns a defective and leaky single-ply roof installed at the School in 1980 and torn out and replaced in 1987 with a built-up roof. At trial, no party challenged the contention that the roof failed and had to be replaced. The trial focused only upon who was responsible and what damages should be awarded.

On or about April 30, 1980, Davis, as general contractor, and the Board, as owner, entered into a contract for the installation of a fully adhered Plymouth SRC membrane roof for the School by virtue of the execution of a change order to the contract executed on or about December 7, 1979 for the alteration and renovation for conversion of the School. Eurell contracted with Davis to install the roof.

The roofing materials were supplied by Plymouth, who issued a limited ten-year warranty.

The Plymouth roof was installed by Eurell and certified as satisfactory by Plymouth in a letter dated December 17, 1980. Leaks began shortly thereafter. Eurell had an arrangement with Plymouth to perform any necessary repairs of the roof pursuant to Plymouth's warranty. Despite repeated repair efforts by Eurell during 1981, leakage continued and worsened. In the spring of 1981, Eurell, directed by Plymouth, undertook cleaning of the roof and re-taping of the joints in an apparent attempt to stem the tide of leaks. This work was completed around November of 1982.

By the beginning of 1983, the general repair work had been completed. After an initial period of relatively infrequent leaks, further serious leakage developed and worsened over the next two years.

After repeated efforts to repair the roof failed, the Board requested that Plymouth and, later, Davis, as general contractor, replace the roof. In March of 1986, after no agreement was reached with either party, the Board contracted with Raintree Industries, Inc. for the replacement of the Plymouth roof with a new roof. All work was completed on the new roof by the summer of 1987.

### Deposition Testimony of James Benn

James Benn's deposition had been taken on April 22, 1988 with all parties in attendance. Benn, project superintendent for Eurell at the time, testified at the deposition that a representative of Plymouth and he discussed the problems with the roof, realized that the roof was failing, and understood that ongoing repairs would not stem the tide of leaks. Following instructions from Plymouth, Benn, nevertheless, wrote the Board recommending that the repair work be continued as before. Benn admitted that he knew that ongoing repair efforts were but a "band-aid" approach for a roofing system that had to be replaced. This testimony prompted the Board to seek leave to file an amended

complaint in order to add fraud and civil conspiracy counts against Eurell and Plymouth. On July 28, 1988, Mr. Benn suddenly died of a massive heart attack. Thus, the Board was forced to rely upon Mr. Benn's deposition testimony.

Eurell moved to preclude the use of Mr. Benn's deposition testimony. Arguing that this testimony, in particular to the extent relied upon by the Board in support of its fraud and civil conspiracy claims, should be excluded as inadmissible hearsay since there supposedly was no "identity of issues" at the time Mr. Benn was deposed and at trial. When Mr. Benn's deposition was taken, the Board's complaint did not assert fraud or concealment against Eurell, only negligent repair or installation of the roof (and a third-party beneficiary claim). Subsequent to and because of Mr. Benn's deposition, the Board amended its complaint to assert fraud and civil conspiracy claims against Eurell and Plymouth. Because at the time of the deposition no such claims were pending, Eurell argued that there was insufficient opportunity to cross-examine Mr. Benn and that accordingly his testimony was inadmissible.

The Board argues that Maryland Rule 2–419(a)(3)(A) removes any hearsay impediment to admissibility of the deposition testimony of a deceased person. It argues that in the case at bar, the prerequisites of this rule have been satisfied and thus Mr. Benn's deposition testimony was admissible. We agree.

Maryland Rule 2–419(a)(3) enumerates the circumstances under which a party may introduce a deposition in lieu of live testimony. Before the rule becomes applicable, deponent must be unavailable and the party against whom the deposition is being used must have been present at the deposition or at least have had notice of it. *Shives v. Furst,* 70 Md.App. 328, 521 A.2d 332, *cert. denied,* 309 Md. 521, 525 A.2d 636 (1987). Eurell contends, however, that Maryland Rule 2–419(c), not Rule 2–419(a), applies. It argues that the filing of the fraud and civil conspiracy counts comprised a "separate, independent and new action" against

Eurell and that, accordingly, Mr. Benn was deposed in "another action." Rule 2–419(c), which governs the use of a deposition taken in another action, predicates admissibility of the deposition testimony upon both the action in which the testimony was given and the action in which it was offered involving the "same subject matter." Eurell claims that the subject matter of the supposed separate action instituted against Eurell for fraud and civil conspiracy and the originally filed action are different. We find no merit in this contention.

There was only one action, Civil Action 86–1428, in which Eurell was named as a defendant by the Board. Under the Maryland Rules, "Action means collectively all the steps by which a party seeks to enforce any right in a court...." Md.Rule 1–202(a). Upon the Board's filing of its Amended Complaint, the Board may have stated a different cause of action but the action itself did not disappear. Thus, we hold that Rule 2–419(a), not 2–419(c), is applicable.

■ The trial court relied on *Huffington v. State*, 304 Md. 559, 500 A.2d 272, *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 722 (1985), in granting the motion to exclude the deposition testimony. (We note that *Huffington* addressed the use of testimony from one criminal trial in a later criminal trial in a different action, a situation more analogous to the situation that Rule 2–419(c) with its same subject requirement is intended to cover.) The court there, quoting McCormick's *Handbook of the Law of Evidence* § 255 (3d. ed. 1984) stated:

> More important, and more often drawn in question is the requirement that the party against whom testimony is now offered, or party of like interest must have a reasonable opportunity to cross-examine. Actual cross-examination, of course, is not essential if the opportunity was afforded and waived. The opportunity must have been such as to render the conduct of cross-examination or the decision not to cross-examine meaningful in the light of the circumstances which prevail when the former testimony is offered.

Counsel for Eurell and Plymouth had the opportunity to cross-examine James Benn. All parties were present and participated in the deposition during which Mr. Benn testified that he knew that the roof was failing and that ongoing repairs were futile. They chose not to direct their questioning toward this testimony.

After the deposition of Mr. Benn on April 22, 1988, the Board filed its proposed amended complaint. On May 10, 1988, the trial court reconsidered and granted the Board's previously denied motion for leave to file the amended complaint, continued the trial at the request of Eurell, and re-opened discovery until August 19, 1988 for the purpose of discovery as to the new claims in the amended complaint.

Mr. Benn died July 28, 1988, over three months after he was originally deposed. Counsel for Eurell, who defended the fraud and civil conspiracy claims asserted by the Board, admitted no knowledge of his death until after his return from a vacation on August 6, 1988. Thus, between May 10, 1988 and August 6, 1988 there was no request by Eurell that Mr. Benn be redeposed. In effect, Eurell had an opportunity to cross-examine Mr. Benn at the time of the original depositions and subsequent thereto, but failed to do so. Benn's testimony was not so remote from the existing issues as to render it unworthy of further exploration. We hold, then, that the testimony of Mr. Benn was admissible to support the fraud and civil conspiracy claims against Eurell.

## Statute of Limitations

Appellee Eurell further contends that the Board's amended complaint was barred by the three-year statute of limitations prescribed by § 5-101 of the Courts and Judicial Proceedings Article of the Maryland Code. Eurell argues that the claims are time-barred because the Board allegedly knew by "late 1984" or "early 1985" that the Plymouth roof had failed and needed replacement. We disagree.

In Maryland, limitations do not commence to run as to a tort claim until the plaintiff knows or reasonably should know of a basis for the cause of action asserted. *Pennwalt Corp. v. Nasios*, 314 Md. 433, 452, 550 A.2d 1155 (1988). Until the deposition of Mr. Benn on April 22, 1988, the Board had no reasonable basis to believe that Eurell had intentionally misrepresented to it the true condition of the Plymouth roof in order to avoid replacing it. This alleged misrepresentation is the basis for their fraud and conspiracy claims against Eurell.

### Maryland Rule 2–332

Appellant Plymouth asserts that the filing of Civil Action No. 86–1428 was barred by Maryland Rule 2–332. Rule 2–332(c) states:

(c) Plaintiff's Claim Against Third Party.—The plaintiff shall assert any claim against the third party defendant arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the third-party plaintiff, and the third-party defendant thereupon shall assert defenses as provided by Rules 2–322 and 2–323 and may assert counterclaims and crossclaims as provided by Rule 2–331. If the plaintiff fails to assert any such claim against the third-party defendant, the plaintiff may not thereafter assert that claim in a separate action instituted after the third-party defendant has been impleaded. This section does not apply when a third-party claim has been stricken pursuant to section (e) of this Rule.

Plymouth argues that by failing to name Plymouth as a defendant in Civil No. 85–895, the Board should have been prohibited from naming Plymouth as a defendant in the second suit, Civil No. 86–1428 and the trial court's opinion and order dated May 27, 1987 denying the motion for summary judgment filed by Davis, Plymouth, and Eurell was in error.

A statement of the purpose and intent of Maryland Rule 2–332 is found in *Harbin v. H.E.W.S., Inc.*, 56 Md.App. 72,

466 A.2d 879 (1983), where the court thoroughly discussed the intent and applicability of former Maryland Rule 315, now Rule 2–332. In the *Harbin* case, the court said:

> The purpose of Maryland Rule 315 in general and 315 d 3 in particular is to avoid circuity of legal actions and resolve disputed jural relationships arising out of the same matter in a single proceeding.

*Harbin,* 56 Md.App. at 78, 466 A.2d 879.

In denying the motion for summary judgment, the trial court in the case *sub judice* stated:

> In the instant case, it is clear under the court's holding in *Harbin, supra,* that the BOARD would be precluded by Maryland Rule 2–332(c) from bringing this action against the Defendants if its previously filed case against DAVIS had been resolved on the merits. But the BOARD never got to that stage of the proceedings; its claim against DAVIS was dismissed summarily by the Court, not based upon the merits of the claim but because the Court ruled that the claim had not been timely filed. The BOARD did not get a chance to litigate whether or not DAVIS breached its contract with the BOARD or was negligent in performing its duties under that contract, nor did the third-party Defendants in that action have to litigate whether they were responsible in any way for any liability DAVIS had to the BOARD. In short, the "disputed jural relationships" arising out of the BOARD's contract with DAVIS and DAVIS' contracts with the third-party Defendants were never litigated or resolved.

We agree with the lower court's reasoning. We hold, as did the trial court, that under the situation here involved, where the Board's claim against Davis in Civil Action No. 85–895 was dismissed on the basis of limitations, the intent and purpose of Maryland Rule 2–332(c) does not prohibit the Board from now filing a separate action against the third-party defendants that it failed to implead in Civil Action No. 85–895. The Board has not yet had a chance to litigate its rights as to any of the parties defendant with respect to the work it had performed on the School. To

preclude it from doing so in this action based upon the technical language of the Rule would seem to be contrary to the intention of the Court of Appeals in adopting the Rule and an unwarranted denial of the Board of its day in court.

### *Warranty Language*

■ Appellant Plymouth next contends that the trial court erred in ruling as a matter of law that the Plymouth warranty was ambiguous and that the term limiting the damages to the original sales price of the product applied only to consequential damages. We hold that this issue should not have been determined as a matter of law.

The relevant language of the Plymouth limited warranty dated December 22, 1980, issued to the Board for the School reads as follows:

### TEN YEAR LIMITED WARRANTY

1. THE WARRANTY

Plymouth Rubber Company, Inc./Plyroof Division of Canton, Massachusetts, hereinafter referred to as "Plymouth", hereby warrants to the purchaser of its Plyroof roofing product as described herein ("The Product"), *subject to the terms, conditions and limitations stated herein,* that the product will remain in watertight condition for a period of ten years from the date of installation and that in the event of failure of the aforesaid product to function as warranted above, whether on account of defective materials, faulty installation or on account of normal processes of wear and aging, Plymouth will make or cause to be made such repairs and maintenance as is necessary to enable the product to perform as warranted above.

2. REFUND OR REPLACEMENT

If the product fails to perform as warranted herein after a reasonable number of attempts on the part of Plymouth (or its designee) to remedy such failure, Plymouth will furnish a new product or a replacement for any

defective part thereof to the purchaser at no cost to the purchaser or, at the purchaser's election refund to the purchaser the purchaser's cost of such products. Plymouth shall have no other obligation or liability hereunder.

. . . .

4. EXCLUSION FROM WARRANTY

(A.) THE LIABILITY OF Plymouth UNDER THIS WARRANTY SHALL NOT INCLUDE ANY LIABILITY FOR ... ANY FAILURE OF THE PRODUCT CAUSED BY STRUCTURAL FAILURE OF THE BUILDING IN WHICH THE PRODUCT IS SITUATED....

(B.) THIS WARRANTY IS EXCLUSIVE AND Plymouth DISCLAIMS AND EXCLUDES ANY OTHER WARRANTY EXPRESSED OR IMPLIED, AS TO MERCHANTABILITY OR FITNESS FOR PURPOSE SOLD. THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION ON THE FACE HEREOF. NO AFFIRMATION BY THE SELLER, BY WORDS OR OTHERWISE SHALL CONSTITUTE ANY SUCH WARRANTY. THE TERMS AND CONDITIONS HEREOF CONTAIN THE ENTIRE AGREEMENT BETWEEN THE PARTIES HEREOF AND MAY NOT BE ENLARGED OR ALTERED BY ANYONE IN ANY MANNER WHATSOEVER UNLESS BY AN OFFICER OF Plymouth IN WRITING.

(C.) *THE LIABILITIES OF Plymouth UNDER THIS WARRANTY ... SHALL IN NO EVENT EXCEED THE AMOUNT OF THE ORIGINAL SALE PRICE.*

(Emphasis added.)

The issue addressed by the trial court after argument by counsel was whether the limitation of damages created in paragraph 4(C) of the warranty applies to all damages under the warranty or whether it only applies to consequential damages. The court decided the issue as a matter of law, and ruled that the limitation was confined to consequential damages only. The trial court instructed the jury to that effect. The court's ruling on the limitations in paragraph 4(C) was based exclusively on the language of

the warranty, without interpretive assistance from any other document.

Plymouth asserts that the essential purpose of its limited warranty was to offer a limited remedy, *i.e.*, all damages were limited to the "Original Sale Price." It argues that if the Board had wanted a no-dollar-limit warranty, it should have shopped for one elsewhere, and no doubt paid more, as it did when it purchased its second roof with its unlimited warranty. There may be merit in this argument.

Equally meritorious is the Board's contention that:

The "exclusion" stated at Section 4(C), if interpreted to apply as argued by Plymouth, would clearly contradict the stated intent of Sections 1 and 2. If Plymouth, under any circumstances, was only obligated to pay "the original sale price," then that would conflict with its unqualified obligations under Sections 1 and 2 whenever the cost of repairing or maintaining the product as watertight, or of replacing it, or of providing a "purchaser cost" refund exceeded "the original sale price."

It is patent that this language is susceptible to more than one meaning. Because the warranty is ambiguous, its language should not have been construed as it was by the trial judge. It is well settled that the construction of a written contract is ordinarily considered to be an issue of law for resolution by the trial judge. *University Nat'l Bank v. Wolfe*, 279 Md. 512, 369 A.2d 570 (1977); *Allen Engineering Corp. v. Lattimore*, 235 Md. 182, 201 A.2d 13 (1964). Only when there is a *bona fide* ambiguity in the contract's language or legitimate doubt as to its application under the circumstances is the contract submitted to the trier of the fact for interpretation. *See Board of Trustees v. Sherman*, 280 Md. 373, 373 A.2d 626 (1977); 4 *Williston on Contracts* § 616 (1961). Ambiguity arises if, to a reasonably prudent person, the language used is susceptible of more than one meaning and not when one of the parties disagrees as to the meaning of the subject language.

*Truck Ins. Exch. v. Marks Rentals, Inc.*, 288 Md. 428, 418 A.2d 1187 (1980).

On remand, the trial court shall allow the jury to interpret the warranty provisions.

## Replacement Damages

Next, Plymouth has asked this court to consider whether the trial court erred in admitting evidence of the cost of the new roof as a measure of damages. Plymouth claims that the jury's award of replacement damages unjustly enriched the Board in violation of the principle stated in *Hooton v. Kenneth B. Muman Plumbing and Heating Company, Inc.*, 271 Md. 565, 318 A.2d 514 (1974). The court in *Hooton, supra,* stated that the plaintiffs were only entitled to a system which could fulfill the warranty made by the defendant, and not one which may be designed to exceed that standard, or one which results in unreasonable economic waste. Plymouth argues that the differences between the Plymouth SRC–30 system and the system installed in 1986 are significant enough that the cost of the 1986 system is an entirely inappropriate measure of damages under the ruling in *Hooton,* and should not have been admitted into evidence. We are not convinced.

Plymouth warranted a roof that "would remain in watertight condition for a period of ten years from the date of installation...." It further promised a "new product or replacement for any defective part thereof" "at no cost to the purchaser" in the event it was not able to remedy any failure of its roof. It is uncontested that the Plymouth roof started to leak shortly after installation. Thus, the Board never really had a roof that was watertight. It is also uncontested that the roof failed and had to be replaced. The Board did not receive the replacement promised when Plymouth was unable to remedy the defects in its roofing system. The Board never had a roof that fulfilled the warranty.

At trial, the Board offered testimony as to the comparable features of the replacement roof. It also offered evidence that it was necessary that the Plymouth roof be replaced with a built-up roof with tapered insulation to insure that it remained watertight. Whereas Plymouth offered evidence as to significant differences between the two roofing systems, it did not offer testimony to refute the conclusion that the new system was necessary to provide a watertight roof as guaranteed by the warranty.

■ The measure of damages in a case such as this is that amount of money which will render that which is guaranteed to be as warranted. *Correlli v. National Instrument Co.*, 240 Md. 627, 632, 214 A.2d 919 (1965). The Board, however, is only entitled to a system which will fulfill the warranty made by appellant, and not one which may be designed to exceed that standard. *Hooton, supra*, 271 Md. at 574, 318 A.2d 514.

The jury, in considering "the evidence and all logical and reasonable inferences deducible therefrom in a light most favorable" to the Board could have found that Plymouth promised a "watertight" roof for ten years but failed to provide one. The jury could also have determined that nothing less than the new roof selected by the Board would achieve that standard promised them. *See Hooton, supra*, 271 Md. at 573, 318 A.2d 514.

■ We further note that the jury was properly instructed on the *Hooton* standard. After reviewing the evidence in light of the instructions, the jury awarded an amount substantially less than requested by the Board. As no other defendant offered an alternative replacement cost to guide the jury, it could have determined that the amount awarded "would render that which is guaranteed to be as warranted." In awarding an amount less than the total replacement cost of the new roof, the jury may have compensated for qualities of the new roof that exceeded "the standard" of Plymouth's warranty. We hold that the trial

court did not err in admitting evidence of the cost of the new roof as a measure of damages.

### Resident Inspector Services

 The Board, on cross-appeal, contends that the trial court erred in refusing to admit evidence of the cost of the resident inspector services and reimbursable expenses under the Board's contract with one Robert M. Stafford, who was hired by the Board as a consultant to find a solution for the problems with the roof. This contract provided for a lump sum fee to Stafford of $31,430 for consulting and design services for the replacement roof. It also stated that the Board would pay Stafford for resident inspector services and other reimbursable expenses as stated at Section III A of the Agreement. At the Board's request, Stafford furnished daily resident inspector services, in the person of J.H. Helms, during installation work at the School. His lodging, meals, and travel were paid for by the Board as reimbursable expenses. The total cost to the Board for the resident inspector services and reimbursable expenses under the Agreement with Stafford totalled in excess of $40,000. The trial court premised its ruling on the fact that similar services and expenses were not necessitated when the Plymouth roof was installed in 1980.

The Board argues that these expenses were part of its overall replacement cost and should be considered by the jury. We agree.

It is a jury question whether these services were necessary to insure that the guaranteed roof would "be as warranted." *Correlli, supra,* 240 Md. at 632, 214 A.2d 919. On remand, we hold that the trial court should allow evidence of these expenses.

### Exclusion of Plymouth's Offer of Settlement Letter

The Board argues that the letter from Robert Harbour of Plymouth, dated January 4, 1985, offering $20,000 "in complete settlement of all liabilities" was admissible in support

of the claims of misrepresentations and to show that the remedy under the warranty failed of its essential purpose.

 It is a well-settled rule that proof of an unaccepted offer to compromise a controversy, or the fact that an offer to compromise was made, is inadmissible against the party who made it as an admission of liability. *Meyer v. Frenkil,* 116 Md. 411, 82 A. 208 (1911). The Board counters, however, that it did not offer the letter to establish liability and, thus, the rule precluding admission of compromise offers should not apply. The Board argues that the letter is probative of an intentional and continuing course of conduct by Plymouth to defraud the Board. The Board further argues that it is probative of Plymouth's consistent efforts to defeat the remedies afforded under its warranty. We disagree.

 The Board seeks to show, through introduction of the letter, that Plymouth misrepresented the true cost of the roof. We see this as having no relevance to the Board's fraud and civil conspiracy claims. These claims are concerned with concealment and misrepresentation of the true condition of the roof, not with any misrepresentation about the cost of the roof itself. We further see the letter as having no relevance to the issue of whether the remedy under the warranty failed of its essential purpose. The Board has asserted that even the full cost of the materials, which it contends is over $117,000, would be inadequate damages. An offer to compromise, even if it does misrepresent costs, is not relevant to the issue of whether original material costs or replacement, including installation costs, are intended by the warranty. We hold that the letter making an offer of settlement was properly excluded.

### *Plymouth's Third–Party Claim Against Eurell for Contribution*

Finally, appellant Plymouth argues that the trial court erred in failing to reform the verdict and revise the judgment to grant Plymouth's cross-claim against Eurell for

contribution. Plymouth contends that a special jury verdict, in which the jury found that the installer contributed to the failure of the roof, but that the manufacturer was not entitled to contribution on its cross-claim, was so inconsistent as to warrant the reformation of the verdict or revision of the judgment. Eurell counters that the trial court erred in failing to grant its motions for judgment, as Plymouth has no cause of action against Eurell for contribution. We agree with Eurell.

 Plymouth asserts that under section 17 of the Maryland Joint Tort–Feasors Act, the right of contribution exists among "joint tort-feasors." In the case *sub judice*, however, the Board did not have a cause of action against Plymouth in tort. Under Maryland law, negligent breach of a contract, absent a duty or obligation imposed by a source independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort. *Heckrotte v. Riddle,* 224 Md. 591, 595, 168 A.2d 879 (1961). We hold then that Plymouth cannot make a claim against Eurell for contribution in this case due to the lack of any right of action on the part of the Board against Eurell in tort.

JUDGMENT REVERSED; CASE REMANDED FOR A NEW TRIAL; ONE–THIRD OF COSTS TO BE PAID BY THE BOARD; ONE–THIRD BY PLYMOUTH; AND ONE–THIRD BY EURELL.