**TRIMED, INC.**

v.

**SHERWOOD MEDICAL COMPANY.**

Civ. A. No. MJG–87–1183.

United States District Court,
D. Maryland.

Aug. 12, 1991.

John E. Griffith, Jr. and Charles P. Scheeler, Baltimore, Md., for plaintiff.

J. Hardin Marion and Thomas M. Wilson, III, Baltimore, Md., for defendant.

## MEMORANDUM

JOSEPH H. YOUNG, Senior District Judge.

Sherwood Medical Company ("Sherwood") moves for a Judgment Notwithstanding the Verdict ("j.n.o.v.") under Fed. R.Civ.P. 50 or in the alternative for a new trial under Fed.R.Civ.P. 59.

"The question to be resolved when deciding a motion for judgment notwithstanding the verdict is whether there is evidence on which a jury can properly base a verdict." *Lust v. Clark Equip. Co.*, 792 F.2d 436, 437 (4th Cir.1986). In determining whether to grant a motion for j.n.o.v., the nonmoving party must be given the benefit of every legitimate inference in its favor, and the motion must be denied if there was evidence upon which the jury could *reasonably* return a verdict. *Cobb v. Nizami, et al.*, 851 F.2d 730, 733 (4th Cir.1988), *cert. denied*, 489 U.S. 1046, 109 S.Ct. 1177, 103

L.Ed.2d 244 (1989), *citing Mays v. Pioneer Lumber Corp.*, 502 F.2d 106 (4th Cir.1974), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1125, 43 L.Ed.2d 398 (1975). (emphasis supplied). A motion for new trial may be granted even though a verdict is supported by substantial evidence if the trial judge "is of the opinion that the verdict is against the clear weight of the evidence, or is based upon evidence which is false or will result in a miscarriage of justice...." *Wyatt v. Interstate & Ocean Transp. Co.*, 623 F.2d 888, 891–92 (4th Cir.1980), *citing Williams v. Nichols*, 266 F.2d 389, 392 (4th Cir.1959). In ruling on a motion for new trial, the district court may weigh the evidence and assess the credibility of witnesses to decide if the jury's verdict was justified. *Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1433 (4th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986).

*Tortious Interference*

Sherwood argues that it is entitled to j.n.o.v. on count I (tortious interference) because (1) the evidence is insufficient as a matter of law to support the jury's special verdict finding tortious interference with Trimed, Inc.'s contracts ("Trimed"); (2) the court improperly instructed the jury on the elements of tortious interference with contract and a properly instructed jury could not have returned a verdict for Trimed; and (3) any claimed interference with Trimed's contracts by Sherwood was justified because Sherwood had a legally protected interest in Trimed's contracts.

Sherwood contends that Trimed did not prove all five elements of a tortious interference claim as it relates to each of the customers: (1) that a valid contract existed between Trimed and that customer; (2) that Sherwood knew of the existence of that contract; (3) that Sherwood, without justification or privilege, intentionally persuaded the customer to breach that contract; (4) that the customer breached that contract because of Sherwood's conduct; and (5) that Trimed suffered monetary damages as a result of the breach caused by Sherwood's conduct. *Stannard v. McCool*, 198 Md. 609, 616, 618, 84 A.2d 862 (1951); *Storch v. Ricker*, 57 Md.App. 683, 703, 471 A.2d 1079, *cert. denied*, 300 Md. 154, 476 A.2d 722 (1984).

■ First, Sherwood argues that Trimed did not establish contracts with all twelve customers. Although Trimed conceded that it had no written contract with the Veterans Administration Hospital ("the VA" or "VA Hospital"), the evidence presented indicated that there was, at least, an oral contract between the two. *See* Tr. at 140 (1/23/91). At the time of Sherwood's alleged wrongful conduct, February 10, 1987, Trimed sold to the VA Hospital all of its enteral feeding product requirements. Pl.Exhs. 397, 398, 399, 400. Between March and December 1987, the VA placed eight orders with Sherwood. Pl. Exh. 440. Thus, there was sufficient evidence from which a rational juror could find that Trimed had an oral contract with the VA Hospital at the time of Sherwood's letter of termination.

■ Next, Sherwood argues that when Trimed wrote to its customers that Trimed was no longer an authorized distributor of Kangaroo products, it repudiated its contracts with those customers and those customers were entitled to treat those contracts as repudiated. However, testimony at trial indicated that Sherwood called, visited or wrote to each of these customers with the intent to induce these customers to cease purchasing from Trimed. (Testimony of Mssrs. Burns, Farb, Flynn, Green, Nixon, Green's calendar, Pl.Exh. 432; 2/10/87 Flynn letter to hospital representatives, Pl.Exh. 68).

■ Sherwood also argues that the court charged the jury improperly by suggesting that breach of contract is not an essential element of a claim for tortious interference. Therefore, it argues, the instruction permitted the jury to hold Sherwood liable for tortious interference if it found either that Sherwood persuaded customers to breach their contracts "*or* that Sherwood deliberately interfered with the carrying out of [Trimed's] contracts." Tr. at 31 (2/14/91).

In *Lake Shore Investors v. Rite Aid Corp.*, 67 Md.App. 743, 509 A.2d 727 (1986), the Court held

> a person who intentionally and wrongfully hinders contract performance, as by causing a party to cancel the contract, and thereby damages a party to the contract, is liable to the injured party even if there is no breach of contract. This sort of conduct is encompassed within the tort that we shall denominate interference with economic relations, and it includes tortious interference with contractual relations.

*Id.* at 753, 509 A.2d 727. In *Orfanos v. Athenian, Inc.*, 66 Md.App. 507, 505 A.2d 131 (1987), the Court, commenting on intentional interference with contract, stated:

> a third party who, without legal justification, intentionally interferes with the rights of a party to a contract, *or* induces a breach thereof, is liable in tort to the contracting party.

*Id.* at 520, 505 A.2d 131. (emphasis supplied). *See also* Restatement (2d), § 766 (1979) ("One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing *or otherwise causing the third person not to perform the contract*, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract"). (emphasis supplied).

■ Thus, the tort of tortious interference with contract is, contrary to Sherwood's contention, subsumed within the broader tort of interference with economic relations. Accordingly, the instruction given by the Court is a proper statement of the law. Consequently, Sherwood's argument that it is entitled to j.n.o.v. because Trimed did not allege all elements of tortious interference with contract when it judicially admitted that Sherwood did not breach Trimed's contracts with Greater Southeast Community Hospital, St. Joseph Hospital and Southern Maryland Hospital, *see* Trimed's Admission of Sherwood's Request for Admissions Nos. 582, 518 and 497, is meritless under *Lake Shore* and *Orfanos, supra.*

■ Sherwood also argues that if it did induce a breach, any conduct inducing a breach was privileged because Sherwood had protected interest in Trimed's contracts. This Court considered and rejected this argument in Sherwood's Motion for Summary Judgment on Counts I and IV and in Sherwood's Motion for Directed Verdict.[1]

■ Sherwood then contends that the Court's failure to instruct the jury on the nature of the privilege available to Sherwood and the distinction between justified and unjustified conduct is reversible error. *RCM Supply Co., Inc. v. Hunter Douglas, Inc.*, 686 F.2d 1074, 1078 (4th Cir.1982).

A privilege instruction in the case at bar is inapplicable. Such an instruction is mandated in a claim of tortious interference with business relations, not in a claim of tortious interference with contract as was the claim here. As discussed above, this Court rejected Sherwood's argument that it was privileged to induce a breach. Accordingly, a privilege instruction was unwarranted. *See Horn v. Seth*, 201 Md. 589, 593, 95 A.2d 312 (1952).

*Unfair Competition*

■ Sherwood maintains it is entitled to j.n.o.v. on count III because there was no evidence of conduct that constitutes unfair competition and alternatively, is entitled to a new trial because the court improperly refused to instruct the jury about Sherwood's right to compete.

> The Court charged the jury as follows: The law of unfair competition is based on the premise that while it encourages fair trade in every way, it aims to promote, not hamper competition, no one is justified in damaging or jeopardizing another's business by fraud, deceit, trickery,

---

1. The case *Institutional Food Mktg. v. Golden State Strawberries,* 747 F.2d 448, 454 (8th Cir. 1984), cited by Sherwood is distinguishable. The Court in that case noted that Missouri courts have held that one with an economic interest in a contract is privileged to induce its breach. Maryland courts have not so held.

or unfair methods of any sort. What constitutes unfair competition in a given case must be decided largely on the particular facts and circumstances of this case.

.... [Y]ou must be guided by the general principle that all dealings must be done on the basis of common honesty and fairness without taint of fraud or deception. If you find that any action by Sherwood such as interfering with Trimed's contracts with its customers, making disparaging remarks about Trimed to Trimed's customers, restricting product shipments, or selected price cutting, if any of those acts were taken to exclude Trimed and Knight Medical from the marketplace, or to damage them as competitors, then you may find that such conduct constituted unfair competition, and you may find for Trimed and award damages that were proximately caused by Sherwood's actions.

Tr. at 35–36 (2/14/91).

Sherwood incorrectly contends that the charge does not reflect the Maryland tort of unfair competition. The Court in *Cavalier Mobile Homes, Inc. v. Liberty Homes Inc.*, 53 Md.App. 379, 389, 454 A.2d 367 (1983) stated that "[u]nfair competition is generally defined in Maryland as 'damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods.... What constitutes unfair competition in a given case is governed by its own particular facts and circumstances.'" This is the charge the Court gave the jury. *See* Prosser and Keeton, *The Law of Torts*, 1015 (5th ed. 1984) ("Unfair competition thus does not describe a single course of conduct or a tort with a specific number of elements; it instead describes a general category into which a number of new torts may be placed when recognized by the courts. The category is open-ended, and nameless forms of unfair competition may be recognized at any time for the protection of commercial values.").

■ As Trimed notes, there was evidence that Sherwood representatives informed Trimed's customers that unless they purchased directly from Sherwood,

Sherwood could not guarantee that they would be able to acquire the necessary supplies of health care products. Tr. at 148 (1/24/91). The same representative told one customer that its contract with Trimed was "null and void," *id.*, and that the representative used "scare tactics" to pressure customers to terminate their contracts with Trimed. Tr. at 55 (1/25/91). Sherwood lowered its prices and offered the feeding sets to Trimed customers at the wholesale price for which Sherwood had previously sold them to Trimed and certain customers considered this pricing unethical. Tr. at 55 (1/25/91). Another Sherwood representative told other Sherwood distributors that they were to sell no product to Trimed. Tr. at 45 (1/31/91). Thus, there was sufficient evidence for a rational jury to find that Sherwood unfairly competed with Trimed.

Sherwood also contends that it is entitled to a new trial because the court refused to give an instruction on Sherwood's right to compete. In *Grempler v. Multiple Listing Bureau*, 258 Md. 419, 424, 266 A.2d 1 (1970), the Court held that "[i]t is fundamental that mere competition by a business rival is not a tortious act; only unreasonable and unfair restraints of trade that injure the public are prohibited." Despite *Grempler*, Sherwood argues, the jury was permitted to find that mere competition by Sherwood was tortious.

The Court instructed the jury that only unreasonable restraints of trade were actionable, stating that "the law of unfair competition is based upon the premise that while it encourages fair trade in every way, it aims to promote, not hamper competition...." Furthermore, Sherwood's proposed instructions were redundant. The Court described for the jury what conduct is considered unfair: "damaging or jeopardizing another's business by fraud, deceit, trickery, or unfair methods of any sort."

There was sufficient evidence for the jury to hold Sherwood liable for the tort of unfair competition under proper instructions.

*Breach of Contract*

Sherwood argues that it is entitled to j.n.o.v. or, in the alternative, a new trial on count IV because (1) the Court improperly instructed the jury that it could consider nonexistent sales goals; (2) Trimed breached the distributorship agreement by failing to give its best efforts to Sherwood's products; and (3) the distributorship agreement was a requirements contract which Trimed breached by not purchasing its requirements from Sherwood.

Sherwood contends that the Court should not have permitted the jury to interpret the "best efforts" clause in the contract, because interpretation of the contract is a question of law for the Court and not one of fact for the jury.

■ Although contract interpretation is generally a question of law[2], this contract required a factual determination as to what is deemed to be "best efforts." *See Bd. of Educ. of Charles County v. Plymouth Rubber Co.*, 82 Md.App. 9, 26, 569 A.2d 1288 (1990) (construction of contract is ordinarily considered to be an issue of law for resolution by trial judge but where there is legitimate doubt as to application under the circumstances, a question of fact is presented). " 'Best efforts' is a term 'which necessarily takes its meaning from the circumstances.' " *Bloor v. Falstaff Brewing Corp.*, 454 F.Supp. 258, 265 (S.D.N.Y.1978), *aff'd*, 601 F.2d 609 (2d Cir. 1979), *citing Perma Research & Dev. v. Singer Co.*, 308 F.Supp. 743, 748 (S.D.N.Y.1970)). The trier of fact is in the best position to make this factual determination, which is dependent upon the circumstances of the case.

■ Sherwood's next argument is that the Court's instruction to the jury was improper since there were no sales goals in effect in 1986 or 1987, and that even if sales goals were in effect during those years, they were not at issue. It claims that what is at issue is, assuming Trimed met its sales goals, whether it may distrib-

ute a competing product and still be meeting the "best efforts" criteria.

The Court, relying upon *Beautis Products Co. v. Chromatic Corp.*, 24 UCC Rep. Serv. 35 (N.Y.Sup.Ct.1978), instructed the jury as follows: "In determining whether or not Trimed used every reasonable and proper effort to advance and increase the sale of the Kangaroo feeding pump system, you can consider in addition to all the evidence, whether Trimed exceeded established sales goals of the pump system. When objective sales criteria are agreed to in a contract, they set the standards by which the distributor performance is measured." Tr. at 38–39 (2/14/91).

There was evidence at trial establishing a factual issue as to whether there were sales goals requirements to be met by Trimed for the years 1986 and 1987, testimony of Robert Burns, thus, reserving the issue for the jury. To determine "best efforts" the Court instructed the jury, "[i]n addition to all the evidence," it may consider established sales goals. Thus, sales goals were not the only evidence the jury was permitted to use in assessing best efforts.

■ Sherwood argues that *Beautis* is inapposite because the distributor in that case never sold a competitor's products to any one, "much less to established purchasers of the manufacturer's products." Defendant's Motion at 18. The issue of whether the distributor sold competitor's products is irrelevant to the fulfillment of the "best efforts" through sales criteria. Again, as discussed above, the Court permitted the jury to use all evidence, including sales goals criteria if so established, to determine best efforts.

■ Sherwood also disputes the jury's decision that Trimed gave its best efforts on behalf of Sherwood's products. It recites the fact that, in the Summer 1986, Trimed attempted to modify its hospital contracts to allow it to substitute a "com-

**2.** Paragraph 5(a) of the Sherwood–Trimed distributorship agreement required Trimed "to use every reasonable and proper effort to advance and increase the sale, distribution and pro-

motion of all items making up the [Kangaroo enteral feeding product] system." The contract is to be interpreted pursuant to New York law.

parable product" and that in September 1986, Robert Burns began to consider distributing Knight Medical's enteral feeding products, a competing line of products. In the Fall of 1986, Burns negotiated a distributorship agreement with Knight and began arranging for evaluations of the Knight product at various hospitals. In late December 1986, Trimed sold Knight products to Howard University and told Knight that Trimed would represent its enteral feeding products. In the beginning of January 1987, Burns told his Trimed salespeople that it was going to carry the Knight line. By February 9, 1987, Trimed was actively marketing Knight products to hospitals.

Burns admitted at trial that Trimed was not using its best efforts during January 1987. Ronald Watkins also testified that Trimed was not using its best efforts in January, explaining that the "circumstances" did not permit him to. Watkins explained that Trimed began sensing "insecurit[ies]" as a consequence of the sale of the Hospital Products Division as well as the resulting difficulties of securing an adequate contract from Sherwood.

The jury also heard testimony that Trimed experienced sales declines due to Sherwood's refusal to make a product more price competitive. Evidence also proffered was that, although Trimed was attempting to market Knight products beginning January 1987, Trimed continued to aggressively sell Kangaroo products.

The jury had all the facts before it and clearly had sufficient evidence from which to reasonably conclude that Trimed satisfied the "best efforts" clause.

■ Sherwood also argues that Trimed breached its distributorship contract when it began using the Knight product. Paragraph 2(a) provides, in pertinent part

> [Sherwood] hereby agrees to sell to Distributor, and Distributor agrees to purchase from [Sherwood], such quantities of the items making up the System as Distributor shall require for sale to hospitals and as [Sherwood] shall have available for sale.

Sherwood maintains that this is a requirements contract and the interpretation of this provision is exemplified by the four-year course of conduct, where Trimed satisfied all its enteral feeding requirements by purchasing Kangaroo products. *See Universal Power Systems v. Godfather's Pizza*, 818 F.2d 667, 671 (8th Cir.1987) (three-and-one-half-year course of dealing established that seller had been buyer's sole supplier of pizza pans and that buyer at least impliedly promised to purchase its pizza pan requirements from seller); *Eastern Air Lines, Inc. v. Gulf Oil Corp.*, 415 F.Supp. 429, 434–35 (S.D.Fla.1975) (buyer's agreement to buy its requirements of Gulf oil from Gulf was construed by parties over thirty-year course of dealing as requirements for fuel).

Trimed contends that "items making up the System" was limited to the Kangaroo products, and that the provision prevented Trimed only from purchasing Kangaroo brand products from anyone other than Sherwood.

Clearly, the parties' course of conduct is indicative of the business relationship between them. However, as Trimed points out, an exclusive arrangement would, in fact, violate antitrust laws due to the size of Sherwood's market share. Since the contract did not expressly prohibit Trimed from carrying a competitive enteral feeding pump line, and the contract provides that Trimed purchase its Kangaroo products from Sherwood only, the plain language of the contract does not prevent Trimed from purchasing competitive products from other sources. *See Laurel Race Course, Inc. v. Regal Constr. Co., Inc.*, 274 Md. 142, 153, 333 A.2d 319 (1974) (intention of the parties is determined from terms considered as a whole and not from clauses considered separately).

Sherwood argues that the logical conclusion is that Trimed could have reduced its requirements for Kangaroo brand products to zero by purchasing Knight products instead, and therefore, the contract required Trimed to buy from Sherwood only what Trimed *wanted* to buy. This is inaccurate. The health-care customer's choice of product is the determining factor. If the customer elects the Kangaroo products,

Trimed is obligated to fulfill its requirement and must do so through Sherwood.

Accordingly, defendant's motion for j.n.o.v. or new trial as to count IV is denied.

*Compensatory Damages*

■ Sherwood maintains that it is entitled to j.n.o.v., or in the alternative, a new trial, since the damage model constructed by Dr. Boland, Trimed's damage expert, was flawed. *See MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1164–66 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *Universal Amusements Co. v. General Cinema Corp.*, 635 F.Supp. 1505, 1525–26 (S.D.Tex.1985).

Dr. Boland assumed an eleven-year damage period from February 9, 1987, through the end of calendar year 1997. Sherwood contends that this calculation was contrary to the Court's jury charge for breach of contract damages.[3] It argues that Dr. Boland was to look into the future for the six months or thirty days as dictated by the Court and the contract, not eleven years. In addition, Sherwood contends that the eleven-year damages calculation was in conflict with the Court's instruction as to tortious interference with contract.[4] Furthermore, Sherwood claims that the projection of eleven years' damages resulting from conduct that followed the termination of a distributorship agreement terminable at will at six months' notice is improperly speculative and out of touch ·with reality. *See Call Carl, Inc. v. BP Oil Corp.*, 403 F.Supp. 568 (D.Md.1975), *aff'd in part, rev'd in part on other grounds*, 554 F.2d 623 (4th Cir.), *cert. denied*, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977).

In fact, the calculation of damages was not in opposition to the Court's instruction. Dr. Boland developed a value for Trimed's business as of February 1987 given the conduct by Sherwood that was the purpose of the action, utilizing the "early termination" set of facts. He then developed a value for Trimed's business assuming that Sherwood had not engaged in the wrongful conduct alleged in the Amended Complaint, but had given Trimed six months' notice on February 9, 1987. The difference between these two figures was the amount of damage sustained by Trimed as a result of Sherwood's activity. Dr. Boland presented these damages to the jury.

The value of Trimed's business under the different scenarios was determined by calculating the present value of prospective future *profit* streams. The future profit stream, calculated by using the loss of value to Trimed's business as of February 1987, is what was calculated eleven years into the future. Dr. Boland's lost profits calculation was based upon the wrongful conduct of Sherwood which allegedly occurred between February and August 1987.

Since Dr. Boland's calculations were established using the thirty and one hundred eighty day termination periods, in accordance with the Court's instructions, the jury verdict is adequately supported.

Trimed's eleven-year calculation was not "out of touch with reality" as Sherwood contends. *In Call Carl*, the Court concluded that plaintiffs' expert's projected damages for periods of three to nine years was not realistic since the leases could be terminated on short notice and gasoline station leases are transitory in nature. *Id.* at 578. Here, Dr. Boland explained why he projected eleven years in advance and why this projection was reasonable: He determined (1) how a potential investor would value a business; (2) a conservative estimate of Robert Burns' work life expectancy; and (3) the value of the business under the two scenarios discussed above. Furthermore,

---

**3.** Contract damages, if any, "must be limited to the lost net profits and the consequential damages, if any, that Trimed establishes it suffered during the appropriate either thirty or hundred and eighty day notice period beginning February 9, 1987." Tr. at 42 (2/14/91).

**4.** The Court relied on *Cunningham v. A.S. Abell Co.*, 264 Md. 649, 659, 288 A.2d 157 (1972) and charged the jury that any damages for tortious interference with contracts must be limited to those sustained during the time each contract remained in force and that "[i]n no event may those contracts be considered to have remained in force after August 9, 1987, because that was the last day of Trimed's legal expectancy under the Sherwood–Trimed distributorship agreement." Tr. at 34 (2/14/91).

Dr. Boland accounted for the "early termination" and "without early termination" scenarios.

■ Sherwood then argues that the damage model failed to account for lawful competition by Sherwood after February 9, 1987. Failure to account for losses sustained by reason of defendant's lawful conduct is flawed. *See Metrix Warehouse v. Daimler–Benz Aktiengesellschaft*, 828 F.2d 1033, 1042–45 (4th Cir.1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1753, 100 L.Ed.2d 215 (1988); *Allegheny Pepsi–Cola Bottling Co. v. Mid–Atlantic Coca–Cola Bottling Co.*, 690 F.2d 411, 415 (4th Cir. 1982). Plaintiff's proof of damages "must provide the jury with a reasonable basis upon which to estimate the amount of losses caused by other factors." *United States Football League v. National Football League*, 842 F.2d 1335, 1378–79 (2d Cir.1988).

■ Dr. Boland did, in fact, account for Sherwood as a competitor. He stated that he took into account that Sherwood was obliged to give Trimed six months' notice and thereafter compete with them in the marketplace. The result was lower sales forecasts for Trimed. *See* Tr. at 177–78 (2/6/91).

Sherwood disputes Dr. Boland's assumptions as to what would occur in the six-month notice period, assuming Trimed was entitled to that time period. Boland assumed that Sherwood "would refrain from interfering with contracts, ... refrain from engaging in trade slander[ ] ... and ... provide the [Kangaroo] product [to Trimed] as needed...." Tr. at 157 (2/6/91). Sherwood contends that he did not assume Trimed's reciprocal obligation to sell only Sherwood products during that six-month period. In fact, Dr. Boland did account for Trimed's obligations under the contract:

I have assumed here that Trimed would have continued to sell Sherwood products to most customers through the end of the six-month period. That is until, I guess that is August, 1987. And that at that time they would attempt to switch their customers from Sherwood to Knight products, and I have made assumptions as to how successful they would be in doing that. I do not assume that all customers would be switched. I have assumed that customers would be lost in the process, and would not wish to switch, but they would switch some percentage.

Bear in mind, that after the end of this notice period, not only does Trimed find itself in the same marketplace that it was in before, but it finds itself in that marketplace as one additional competitor, namely Sherwood. Sherwood is now competing directly with Trimed and that has to be reflected in here also. So I haven't assumed a hundred percent success in keeping their existing customers. Tr. at 126 (2/6/91).

Dr. Boland did state, as Sherwood observes, that he arrived at higher projected levels of sales upon six months notice than the level of sales he projected on early termination because "Trimed would have had an opportunity to attempt to replace the Sherwood product with the Knight product in their existing customer base." Tr. at 129 (2/6/91). However, he added that the higher projected levels were based on additional factors: (1) Trimed "would have the opportunity to work with customers and try to maintain them, and presumably we [sic] have kept some percentage of the business," and (2) Trimed would not have suffered "the significant financial load they suffered" and would have been able to effectively market the product in the future. *Id.* Although the thrust of Dr. Boland's calculations incorporate Trimed's obligation to market Sherwood's products only, it is arguable that he suggested that Trimed would not have waited the six months to market the Knight line. Thus, this is an issue of credibility for the jury. *United States v. Hale*, 422 U.S. 171, 176, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1974). *See* 81 Am.Jur.2d, Witnesses § 665 n. 50 (right of jury to pass upon credibility of a witness based on whether he has made prior statements which are inconsistent with his trial testimony).

Sherwood then argues that Dr. Boland's calculation included damages resulting

from the loss of sales of products other than enteral feeding products, contrary to the Court's charge.[5] He included in his calculations sales of other products in the hospital and home care division that he determined Trimed found increasingly difficult to sell as a result of Sherwood's conduct, including the difficulty of accessing these customers. This financial harm was directly attributable to, and thus proximately cause by, Sherwood's actions. Consequently, the calculations are reasonable.

■ The calculation was premised on Trimed's entitlement to six months' notice.[6] Sherwood argues that it cannot be determined by the special verdict form whether the jury found that Trimed was entitled to six months' notice of termination and, therefore, j.n.o.v. or a new trial is mandated. *See Taherzdeh v. Clements,* 781 F.2d 1093 (5th Cir.1986) (when a party objects to the court's failure to submit to the jury an issue of fact in the form of a special interrogatory, the trial judge has no authority to make an express finding under Fed. R.Civ.P. 49(a) concerning the same issue).

The jury was instructed that if they found Sherwood unfairly competed or breached its contract, they could award damages from zero to $659,194. Tr. at 37–38 (2/14/91). Having been explicitly told that Dr. Boland's calculations were premised on the six month termination scenario and having awarded plaintiffs the total sum of damages, the jury unquestionably concluded that Sherwood's termination was permissible only upon six months' notice. Also, unlike the findings in *Taherzadeh,* the Court made no express findings under Fed.R.Civ.P. 49(a).[7]

Sherwood argues that Dr. Boland's calculation of $659,194 includes amounts attributable, in part, to count II (trade slander) even though the Court directed a verdict in Sherwood's favor on that count. Dr. Boland's calculation for the *six-month scenario* assumed that Sherwood would live up to its contractual obligations during the six-month notice period. Tr. at 157, 244 (2/6/91). Furthermore, he never assumed that there was trade slander or other wrongful conduct after the six-month period. Tr. at 157. (2/6/91). Thus, his calculation of $659,194 for the six-month scenario did not account for trade slander but solely for breach of contract and unfair competition.

Finally, Sherwood argues that it was free under its distributorship agreement to sell directly to home care dealers, as charged by the Court, tr. at 39 (2/14/91), and therefore Trimed could not recover breach of contract damages for lost home care dealer business.

■ Although the jury disregarded the Court's instruction, finding Sherwood liable for breach of contract of Trimed's home care business, this amounts only to harmless error. The Court's instruction stated:

Under the Sherwood/Trimed distributorship contract, or agreement, Sherwood agreed to name no other distributor to hospitals for enteral feeding products which it manufactured within the territory that was Trimed's territory, and both Sherwood and Trimed were free to sell directly ... to home care dealers ... and consequently, a sale of the enteral feeding products by Sherwood to ... home care dealer[s] ... would not constitute a

---

**5.** The Court charged the jury that any damages recoverable for tortious interference with contract, unfair competition, or breach of contract must be those directly or proximately caused by Sherwood's conduct. Tr. at 31, 36, 41 (2/14/91).

**6.** If the jury finds that Sherwood had no obligation to give six month[s] notice, but was, in fact, only required to give say thirty days notice, obviously, my damage calculation would not apply to that case as it stands. Tr. at 164 (2/14/91).

**7.** *Gill v. Rollins Protective Services Co.,* 722 F.2d 55 (4th Cir.1983), is distinguishable. The case was submitted to the jury on theories of common law negligence and violations of Virginia's Consumer Protection Act. The jury returned a general verdict for the plaintiffs for $238,000. On appeal, the Fourth Circuit could not determine whether the jury found for plaintiffs on the negligence count or the statutory issue and only the statutory theory permitted $238,000. The Court ordered a new trial. Here, both theories of unfair competition and breach of contract permit $659,194 recovery.

breach of the agreement by Sherwood in the agreement between Sherwood and Trimed.

Tr. at 39–40 (2/14/91). The instruction was erroneous. The evidence showed that Sherwood provided Trimed with its home care and nursing business. Martin Farb, Sherwood's Executive Vice President, conceded that although Sherwood "ma[d]e some sales directly to home care dealers, ... the vast majority of the home care business and the nursing home business, we turned over to our institutional dealer network, Trimed included." Tr. at 58 (1/29/91).

> ... What I directed over time early in the contract career, sometime in 83, 84, I directed our people to start turning all of our home care business over to institutional dealers, and even though it did not call for it in the contract, to just give them this business, and give them that business because the more business they have, the more profits they are going to make, and the more successful they are going to be.

Tr. at 146 (1/28/91). The jury disregarded an erroneous instruction, returning a verdict which it would clearly have returned absent the instruction, constituting harmless error. *See Garnatz v. Stifel, Nicolaus & Co.,* 559 F.2d 1357, 1362 (8th Cir. 1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1578, 55 L.Ed.2d 801 (1978) (jury's failure to follow the trial court's erroneous instruction is not sufficient ground for a new trial if it is otherwise clear that the verdict is just), *citing Lazier Gas Engine Co. v. Du Bois,* 130 F. 834 (3rd Cir.1904) ("where the court is convinced and is able to demonstrate that the verdict on the whole was a just one, and that certain instructions as to the measure of damages given by the court to the jury, and apparently disregarded by them, were erroneous, and that the verdict did not substantially exceed an amount that would have been just and right had proper instructions been given, it would be a sacrifice of justice for no good purpose to set aside such a verdict on the ground that the jury had disregarded the instructions of the court in rendering it."). *See also Dean v. Redmiles,* 280 Md. 137, 169, 374 A.2d 329 (1976) (complaints that a verdict should have been directed against Dean and that instructions given were unduly favorable to him are without merit since if there were error it was cured by the jury's verdict against Dean).

Sherwood argues that Trimed was unable to present evidence that any action by Sherwood caused any noncontract customer either to cease purchasing from Trimed or to purchase less from Trimed and, therefore, Dr. Boland's calculation of $659,194 in damages was unsupported by the record. Sherwood also argues that Boland did not specifically analyze any unfair mode of competition. These issues were addressed in the Court's memorandum, *supra* pp. 885–890, respectively.

*Punitive Damages*

The Court's decision on punitive damages is discussed in the Memorandum denying Defendant's Motion for Post–Verdict Review of and Relief from the Punitive Damage Award. The Court denies j.n.o.v. and a new trial as to Counts I and III and accordingly, defendant's punitive damages argument as it relates to these Counts is moot.

The evidence was sufficient for a reasonable jury to find Sherwood liable and the verdict was not against the clear weight of the evidence. Accordingly, the Court denies defendant's motion for j.n.o.v. or, alternatively, a new trial.