**TRIMED, INCORPORATED, a Maryland Corporation, Plaintiff–Appellee,**

v.

**SHERWOOD MEDICAL COMPANY, a Delaware Corporation, Defendant–Appellant.**

No. 91–2210.

United States Court of Appeals, Fourth Circuit.

Argued May 5, 1992.

Decided Oct. 15, 1992.

As Amended Nov. 3, 1992.

J. Hardin Marion, Tydings & Rosenberg, Baltimore, Md., argued (Thomas M. Wilson, III, on brief), for defendant-appellant.

John Earl Griffith, Jr., Piper & Marbury, Baltimore, Md., argued (Charles P. Scheeler, William W. Toole, Ann Burke Lloyd, William Single, IV, on brief), for plaintiff-appellee.

Before RUSSELL and LUTTIG, Circuit Judges, and KELLAM, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

DONALD RUSSELL, Circuit Judge:

Appellant Sherwood Medical Co. appeals a jury verdict and awards for Trimed, Inc. in an action for tortious business practices and breach of contract. Sherwood challenges the court's jury instructions under Maryland law regarding tortious interference with contracts, unfair competition,

and punitive damages. It also asserts sufficiency of the evidence challenges. We find that the district court did not err in any of its challenged jury instructions. We also find the evidence sufficient to support the jury's verdict and awards. Accordingly, we affirm the verdict and awards below.

## I.

Sherwood is a Delaware corporation that manufactures and distributes medical equipment and supplies. Trimed is a Maryland corporation that supplies medical products to hospitals and other health-care providers in the Baltimore–Washington area.

Around 1981, Trimed began distributing Sherwood's Kangaroo brand enteral feeding pump and the accessory feeding bags and tubing sets.[1] In September 1982, Trimed entered into a contract that made Trimed the exclusive distributor of Sherwood products to hospitals in the Baltimore–Washington area.[2] The contract obligated Trimed to use its best efforts to promote the sale of the Kangaroo system to hospitals. It did not, however, prohibit Trimed from selling similar product lines of other medical equipment manufacturers. Sherwood agreed in return to supply Trimed's requirements and to appoint no other distributor to hospitals in the stated territory. Sherwood retained the right to sell directly to nonhospital customers. The contract provided for termination on thirty days' notice with cause or on six months' notice without cause.

Trimed typically leased the Kangaroo pumps to its customers and collected rent in the form of profits from the sale of feeding bags and other accessories. This arrangement benefitted both parties because the equipment often needed servicing. Under the lease terms, Trimed would temporarily replace broken pumps while servicing the leased equipment.

During 1985 and 1986, many competitors entered the market for enteral feeding system supplies, offering their products at substantially lower prices. The competing supplies fared especially well in the home health care market, which is more price sensitive than the hospital market. Trimed alerted Sherwood of this competition and warned Sherwood that it would have to lower its prices to remain competitive. In response, Sherwood offered only price reductions in the form of rebates to its distributors on a hospital-by-hospital basis, but refused to lower prices.

Also in 1986, Trimed and other distributors began to worry about the security of their distributorship relationship. Until November 1986, the Kangaroo system was manufactured by the Hospital Products Division of Chesebrough–Ponds. When Sherwood purchased the division at that time, distributors were concerned that Sherwood might terminate their relationship, and, consequently, they sought new, long-term contracts. Trimed expressed its concerns to Sherwood's vice president and also informed him that it was considering other lines of products due to its insecurity. Sherwood promised a contract, but delayed producing one, even after repeated requests.

Trimed began losing customers from price competition. It decided to add another product line from one of Sherwood's competitors, Knight Medical Inc. (KMI). Trimed notified Sherwood of its intent, but assured Sherwood that it would continue to sell the Kangaroo products to its non-price-sensitive customers. Subsequent negotiations between Trimed and Sherwood followed but failed to produce any agreement. Sherwood would not agree to lower its prices and, because of this, Trimed would not agree to deal exclusively in Sherwood products. Trimed maintains that Sherwood threatened to put Trimed out of business if it began selling KMI's line. Sherwood, in

1. The pump was designed to feed comatose patients or those who could not otherwise normally ingest food. The system consists of plastic feeding bags and a pump that regulates the flow of liquid food from the bag, through a tube into the patient's stomach.

2. The contract was between the Hospital Products Division of Chesebrough–Ponds, Inc. (HPD) and Trimed. In 1986, Sherwood purchased HPD and assumed its contracts. We refer to Sherwood and its predecessors as Sherwood in order to simplify the facts.

contrast, explains that it told Trimed that if Trimed decided to distribute KMI products, Sherwood would vigorously compete to retain its customers.

On February 9, 1987, Sherwood terminated the distributorship contract, alleging as cause Trimed's failure to use its best efforts to promote the Kangaroo line. The letter gave Trimed thirty days' notice as required by the contract for termination for cause. However, Trimed asserts that Sherwood immediately notified hospital customers that Trimed was no longer an authorized Kangaroo distributor and that Kangaroo products were to be purchased directly from Sherwood. In addition, Sherwood cut its prices on the Kangaroo line in order to meet the price competition and refused to ship any Kangaroo products to Trimed. As a result of these actions, some of Trimed's hospital customers broke their contracts with Trimed and others, while not technically breaching their contracts, did not renew orders as expected.

Trimed brought a diversity suit against Sherwood in the United States District Court for the District of Maryland pleading several counts. The ones relevant to this appeal are as follows:

Count I—Tortious interference with Trimed's contracts with its customer hospitals to supply accessories and repairs for the Kangaroo enteral feeding pumps.

Count II—Trade slander in the form of falsely representing to customers that Trimed could no longer supply Sherwood products.

Count III—Unfair competition causing Trimed's customers to breach their contracts.

Count IV—Breach of contract without cause and without giving the required notice.

At the close of the evidence, the court directed a verdict for Sherwood on Trimed's trade slander count (Count II). The jury then returned a verdict for Trimed on the remaining counts for tortious interference with contracts, unfair competition, and breach of contract (Counts I, III and IV). It awarded Trimed compensatory damages of $876,180 and punitive damages on Counts I and III of $3,014,060.91. Sherwood moved for a j.n.o.v., which motion was denied by the district court. *Trimed, Inc. v. Sherwood Medical Co.*, 772 F.Supp. 879 (D.Md.1991).

This appeal followed. Sherwood raises numerous issues, which we discuss in turn.

## II.

██ Sherwood first argues that judgment for Trimed on Count I (tortious interference with contracts) cannot stand because (1) the judge improperly instructed the jury on the requirements of tortious interference with contracts; (2) the evidence was insufficient to support the jury's verdict; and (3) the evidence was insufficient to support the jury's award. Issue (1) requires an interpretation of state law which we review *de novo*. We review issues (2) and (3) more deferentially. In reviewing denials of motions for j.n.o.v, we must determine whether a reasonable jury, based on the evidence presented, could have found the verdict. *Hamilton v. 1st Source Bank*, 895 F.2d 159, 162 (4th Cir.), *rev'd in part on other grounds*, 928 F.2d 86 (1990) (en banc); *Austin v. Torrington Co.*, 810 F.2d 416, 420 (4th Cir.1987), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1988). On appellate review, we do not weigh the evidence nor judge the credibility of witnesses. *Hamilton*, 895 F.2d at 162; *Austin*, 810 F.2d at 420.

A. Sherwood contends that the district court improperly instructed the jury on the requirements of tortious interference with contract under Maryland law. Its argument in this regard has two parts. First, Sherwood challenges the court's instruction that the jury could "consider economic losses that resulted from the non-renewal of any contract which it reasonably appeared would have been renewed by Trimed's customers in the absence of Sherwood's conduct." Trial Tr., Jury Charge 34 (copy in J.A. at 1526, 1551.) Sherwood contends that Trimed asserted only the narrow claim of inducing the breach of an existing contract, which, as its name suggests, requires a contract breach for recovery. Trimed, it contends, did not assert a claim for the

broader tort of interference with business relationships. Thus, Trimed should not recover for non-renewals.

Second, Sherwood challenges the court's refusal to give a proffered instruction on competitive justifications—that Sherwood was allowed to compete for business provided it did not employ unlawful means. Sherwood contends that if it is to be held liable for contract interference short of inducing a breach, Maryland law requires that the jury find Sherwood used *unlawful* means.

█ Maryland law has long recognized the tort of interference with contracts. *See, e.g., K & K Management v. Lee,* 316 Md. 137, 557 A.2d 965, 973–74 (1989); *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 485 A.2d 663, 674 (1984); *Knickerbocker Ice Co. v. Gardiner Dairy Co.,* 107 Md. 556, 69 A. 405, 406 (1908). In its most obvious form, the tort encompasses wrongful interference with a party to a contract resulting in a breach. *See Natural Design,* 485 A.2d at 674 (citing prior cases so holding); *Wilmington Trust Co. v. Clark,* 289 Md. 313, 424 A.2d 744, 754 (1981) (third party who intentionally induces breach is liable in tort); *Baird v. Chesapeake and Potomac Telephone Co.,* 208 Md. 245, 117 A.2d 873, 880 (1955) (if party employs wrongful means to cause breach of contract, party is liable in tort); *see also* Restatement (Second) of Torts § 766 (1977) ("One who intentionally ... interferes with the performance of a contract ... is subject to liability...."). However, "proof of breach of contract is not an essential element of the tort." *Lake Shore Investors v. Rite Aid Corp.,* 67 Md.App. 743, 509 A.2d 727, 729 (Md.Ct.Spec.App.1986); *see also Goldman v. Harford Road Bldg. Ass'n,* 150 Md. 677, 133 A. 843, 845 (1926) (ruling that right of action existed against third party where contract terminated without breach); *Lucke v. Clothing Cutters Assembly,* 77 Md. 396, 26 A. 505, 508 (1893) (holding union liable for wrongful interference in employment termination despite absence of employment contract). Under Maryland law, inducement to breach is a branch of the broader tort of interference

with business relationships. *K & K Management,* 557 A.2d at 973; *Natural Design,* 485 A.2d at 674; *Lake Shore Investors,* 509 A.2d at 731. "[T]he broader form ... encompasses other sorts of wrongful interference with contractual relations; or indeed, with business expectations, or economic relationships where no contract exists." *Lake Shore Investors,* 509 A.2d at 731; *see also K & K Management,* 557 A.2d at 973–74; *Natural Design,* 485 A.2d at 674; *cf.* Restatement, *supra,* at § 766B (stating tort of intentional interference with prospective contractual relationship).

█ Trimed asserted a claim in Count I for "interference with contracts," including inducement to breach as well as interference with ongoing or expected contractual relationships. Am.Compl. 10–11 (copy in J.A. at 13, 22–23). Contrary to Sherwood's argument then, the claim asserts more than the narrow tort of inducing the breach of an existing contract. Trimed's Count I includes claims for interference with contract renewals or contract expectations. Since Trimed asserts the broader tort, it does not need to show contract breach in order to recover damages. The district court's jury instructions correctly stated the law on this issue.

This case is factually similar to *Lake Shore Investors.* There, the Court of Special Appeals held that plaintiff's "Wrongful Interference With Contracts" claim, 509 A.2d at 728, was "encompassed within the tort that we shall denominate interference with economic relations, and it includes tortious interference with contractual relations." *Id.* at 732. Plaintiff in *Lake Shore* sought damages against a third party for inducing a contracting party to withdraw from a real estate purchase contract, even though the withdrawal did not constitute a breach of the terms of the contract. The court refused to narrowly construe all interference with contract claims as inducement to breach claims, requiring breach for recovery. In so doing, it expressly overruled a prior Court of Special Appeals case which held that breach of contract was an essential element of a tortious interference claim. *Id.* at 731.

Contrary to Sherwood's second challenge to the jury instructions, Maryland law does not require that a plaintiff prove unlawful conduct by defendant in order to sustain a claim of interference with contractual relationships. Rather, a plaintiff must only show wrongful conduct. Maryland courts have consistently held that "a person who *intentionally and wrongfully* hinders contract performance, as by causing a party to cancel the contract, and thereby damages a party to the contract, is liable to the injured party even if there is no breach of the contract." *Lake Shore Investors*, 509 A.2d at 732 (emphasis added); *see K & K Management*, 557 A.2d at 973; *Natural Design*, 485 A.2d at 675–76. The court in *K & K Management* quoted the Restatement factors for determining whether conduct was wrongful in the context of a business interference allegation.[3] 557 A.2d at 975 and n. 7. Unlawful conduct is one factor to be considered by a court, § 767 cmt. (c), but not a necessary element to prove wrongful conduct. Again, we find that the district court's instructions correctly stated the law.

B. Continuing with Sherwood's Count I issues, Sherwood next claims that the jury did not have sufficient evidence to support its verdict for Trimed on Count I. Trimed had sought damages for interference with twelve supply contracts. Sherwood argues, essentially, that since Trimed judicially admitted that three contracts were not breached, and since there is no proof of breach or inducement to breach in several other contracts, that Trimed is not entitled to a favorable verdict and damages for these contracts.

As we stated above, Maryland law does not require proof of a contract breach. An "action may lie when there has been a wrongful interference with contractual rights or expectations, even if there is no breach." *Lake Shore*, 509 A.2d at 730. Since Sherwood bases its Count I sufficiency challenge on the necessity of a breach, and since the claim relies on Sherwood's erroneous assertion of the law, we dispose of the claim without considering the relevant facts.

C. Sherwood finally claims that the evidence was insufficient to support the jury's damages award on Count I. Sherwood's argument in this regard relies on the success of its insufficiency argument in B above. It contends that since damages were calculated as a lump sum for all twelve contracts, if the finding of tortious interference were reversed for any one contract, the lump sum damages award should not be sustained. Since we dismissed the sufficiency claim above, Sherwood's claim as to damages has no merit.

### III.

Sherwood next seeks to overturn the jury verdict on Count III (unfair competition) on the grounds that (1) the court improperly instructed the jury on unfair competition and (2) the evidence is insufficient to support the jury's verdict. Issue (1) encompasses both review of Maryland tort law and review of the district court's formation of jury instructions. We, of course, review the Maryland law issues *de novo*. We review the court's formulation of jury instruction for abuse of discretion. *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1164 (4th Cir.1986). We employ the same standards of review on the sufficiency issue as discussed in section I above.

A. Sherwood principally challenges the district court's refusal of its competitive justification instruction. The court reject-

---

**3.** Restatement (Second) § 767 states:

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,
(b) the actor's motive,
(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,
(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
(f) the proximity or remoteness of the actor's conduct to the interference and
(g) the relations between the parties.

ed Sherwood's instruction as "redundant" of the planned charge. The court instructed the jury, in pertinent part:

> The law of unfair competition is based upon the premise that while it encourages fair trade in every way, it aims to promote, not hamper competition, no one is justified in damaging or jeopardizing another's business by fraud, deceit, trickery, or unfair methods of any sort. What constitutes unfair competition in a given case must be decided largely on the particular facts and circumstances of this case.
>
> . . . . .
>
> [Y]ou must be guided by the general principle that all dealings must be done on the basis of common honesty and fairness without taint of fraud or deception. If you find that any action by Sherwood such as interfering with Trimed's contract with its customers, making disparaging remarks about Trimed to Trimed's customers, restricting product shipments, or selected price cutting, if any of those acts were taken to exclude Trimed and Knight Medical from the marketplace, or to damage them as competitors, then you may find that such conduct constituted unfair competition, and you may find for Trimed and award damages that were proximately caused by Sherwood's actions.

Jury Charge 35–36 (J.A. at 1552–53). Sherwood also contends that the instructions were contrary to Maryland law because, essentially, they permitted the jury to find unfair competition from lawful, competitive conduct. For example, as instructed, the jury could find unfair competition in "selected price cutting" that was nonpredatory and did not violate state or federal antitrust laws.

■ The Maryland Court of Appeals set out the doctrine of unfair competition in *Baltimore Bedding Corp. v. Moses*, 182 Md. 229, 34 A.2d 338 (1943):

> [W]hile it [the law] encourages fair trade in every way and aims to foster, and not to hamper, competition, no one, especially a trader, is justified in damaging or jeopardizing another's business by fraud,

deceit, trickery or unfair methods of any sort. . . . What constitutes unfair competition in a given case is governed by its own particular facts and circumstances. Each case is law unto itself, subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception.

34 A.2d at 342; *see also Edmondson Village Theatre v. Einbinder*, 208 Md. 38, 116 A.2d 377, 382 (Md.1955); *Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*, 53 Md.App. 379, 454 A.2d 367, 374 (Md. Spec.Ct.App.1983). Maryland case law has never required an unlawful act as an essential element of an unfair competition claim. Thus, the district court's instructions were not in error on this issue.

■ Nor do we find that the district court abused its discretion in refusing Sherwood's competitive justification instruction. "A district judge has broad discretion in framing his jury instructions. If the instructions correctly state the law and adequately cover the issues in the case, the charge is sufficient." *Lohrmann*, 782 F.2d at 1164. The court's instructions here informed the jury of the competitive premise underlying the unfair competition doctrine. Since the court's instructions were taken almost verbatim from *Baltimore Bedding*, which is the most comprehensive Maryland case on the doctrine of unfair competition, we will defer to the court's decision on this matter.

B. Sherwood's insufficiency claim is based on its argument in A above. That is, Trimed presented no evidence of an antitrust violation or other unlawful act to sustain the jury's unfair competition verdict. Since we do not accept Sherwood's premise, its claim on this Count fails and requires no further discussion.

## IV.

Sherwood challenges the jury verdict on Count IV (breach of contract) on two grounds: (1) the evidence is insufficient to support a finding that Sherwood breached the distributorship contract with Trimed;

and (2) assuming a breach did occur, damages were improperly calculated. Since both issues were within the province of the jury, we review Sherwood's Count IV claims under the deferential reasonable jury standard discussed in section I above.

█ A. Sherwood contends that the evidence does not support the jury's finding of breach. Under the terms of the distributorship contract, either party was entitled to terminate the relationship upon thirty days' notice for cause or upon six months' notice without cause. Sherwood argues that because Trimed failed to meet its contractual obligations, termination with thirty days' notice was proper. Paragraph 5(a) of the contract required Trimed to:

> use every reasonable and proper effort to advance and increase the sale, distribution and promotion of all items making up the [Kangaroo enteral feeding product] System.

Sherwood asserts that when Trimed began selling KMI's line of competing supplies, Trimed could not fulfill its obligations under paragraph 5(a). Trimed argues in reply that it met and far exceeded its sales quota set in the agreement, which constitutes *per se* compliance with the paragraph 5(a) requirements. Therefore, Trimed argues, the jury correctly found that Sherwood had no cause for termination and Sherwood was required to give six months' notice of termination.[4]

Even if the jury did not accept Trimed's quota argument, it could reasonably have found that Trimed did not violate the terms of the contract. Trimed's evidence substantiates its contention that "every *reasonable* and proper effort" was used to promote the Kangaroo line. Trimed testified that it warned Sherwood about the price competition and repeatedly requested Sherwood to lower its prices. When it refused, and when competitors threatened

Trimed's business, Trimed began offering the alternative KMI line only to price-sensitive customers rather than lose their business altogether. It continued to sell Sherwood's products to a substantial majority of its customers. Absent cause then, Sherwood was required to give six months' notice for termination of the agreement, which it admittedly did not do.

B. Sherwood also challenges the jury's acceptance of the damages figure calculated by Trimed's expert witness, Dr. Boland. Sherwood asserts that the figure represents net profits Trimed would have earned for eleven years subsequent to the breach if Sherwood had given proper notice. This award would have been improper since Sherwood was permitted under the contract terms to terminate without cause at any time with six months' notice. In addition, the trial court instructed the jury that breach of contract damages must be limited to damages incurred during the six-month period of time following termination by Sherwood.

█ Contrary to Sherwood's argument, Dr. Boland's analysis appears to be consistent with the court's instruction. In calculating damages, Dr. Boland computed the present value of an eleven-year stream of net Trimed profits in February 1987 given the actual abrupt termination of the contract and the present value of an eleven-year stream of profits if Trimed had been given a six-month period to prepare for the distributorship termination. The difference between the two constituted the damages. In other words, Dr. Boland measured the loss in value of the business as a result of Sherwood's sudden discontinuance of the contractual relationship. Dr. Boland explained to the jury his various reasons for choosing an eleven-year time span,

---

**4.** Sherwood also claims that it is not clear whether the jury found a breach based on Sherwood's failure to give thirty days' notice or based on its failure to give six months' notice. In other words, the jury did not specify whether or not Sherwood had cause to terminate the contract. Trimed had asserted in the alternative that Sherwood breached both notice re-

quirements. Thus, Sherwood argues, the Court cannot assume that the jury found no cause for termination. We disagree. The district court rejected this argument, reasoning that since the jury awarded damages based on breach of the six month notice provision, it must have found there was no cause for termination. *Trimed*, 772 F.Supp. at 889.

which the jury presumably thought sufficient, as do we.[5]

The district court instructed the jury that under New York law, which governs this agreement, Trimed could recover lost profits and consequential damages suffered as a result of a contract breach. The damages would then be limited to those incurred during the six months following breach. Consistent with this instruction, Dr. Boland included in his computation lost profits on Kangaroo sales for six months as a result of the breach.[6] He also computed consequential damages incurred at the time of breach, that is, loss in value of the business as a going concern due to loss of customer goodwill.[7] The eleven-year income stream absent breach did not include an eleven-year relationship between Trimed and Sherwood and continuing profits from the sale of Sherwood's Kangaroo line for that time period. It only accounted for a six-month relationship, plus the preservation of some goodwill between Trimed and its customers.[8] Thus, Dr. Boland did not attempt to calculate eleven years of profits given the continuance for that period of time of the Trimed/Sherwood contract. We believe the damages calculation was not at odds with the court's instructions regarding permissible damages under New York law.

Furthermore, the evidence appears sufficient to support the jury's acceptance of Dr. Boland's damages figure. According to testimony offered by Trimed, Sherwood gave thirty days notice of its termination decision, yet, in fact, immediately terminated Trimed. Sherwood refused to ship supplies to Trimed and within days of the termination notice began informing Trimed's customers of the severed relationship. From this evidence, the jury could reasonably find that the sudden termination damaged Trimed's customer relations, resulting in a loss of goodwill.

## V.

 Sherwood next contends that the $659,194 in damages awarded Trimed for Counts III (unfair competition) and IV (breach of contract) is insupportable because it was based on a calculation made by Dr. Boland for injury resulting from Counts II (trade slander), III and IV. Dr. Boland acknowledged that his damages went to the conduct charged in the first

5. When asked why he chose an eleven-year stream of profits, Dr. Boland testified:

There are a number of considerations that were built into that. Obviously, if someone is valuing a business, they look forward into the future, either until they think the business will no longer cease to exist, or as far as they can reasonably for see [sic] what will happen. There are a number of things then to think about.

One, would be the work life expectancy of Mr. Burns. Mr. Burns is the principal of [Trimed] and is considered to be a major factor in the company's success.

Another issue might be how far into the future, there would actually be a difference in the profits under the two scenarios, whether they would converge at some point and there wouldn't be any difference at some time in the future.

Another factor might be how far into the future you would have to go so the profits would no longer matter to a potential investor.... Most of those considerations would have led me to select a period of time of fifteen years or more. I actually chose a period of time a little over ten years.

Trial Tr., Boland 118–19 (copy in J.A. at 259, 273–74).

6. Dr. Boland testified that he had not separately calculated lost net profits for the six-month period immediately following termination. However, he did calculate sales, gross profits and expenses during that time and could have determined a figure from his data. Boland 169 (J.A. at 324).

7. Consequential damages are generally defined as "[s]uch damage, loss or injury as does not flow directly and immediately from the act of the party, but only from some of the consequences or results of such act." Black's Law Dictionary 390 (6th ed. 1990).

8. When asked whether his damages limited business dealings between Sherwood and Trimed to the six-month termination period, Dr. Boland testified:

"I think my assumptions are exactly that. That Sherwood would live in accordance with the terms of the contract during the six month period."

. . . . .

After that would become a competitor with all the vigor they may want to summons to do that.

Boland 244 (J.A. at 399).

four counts. He then separated out damages for Count I only. The court directed a verdict for Sherwood on Count II, so that any damages exclusively attributed to that Count could not properly be awarded by the jury.

We dismiss this claim because Dr. Boland's calculation of damages did not include damages exclusively for trade slander. Dr. Boland's calculation was based on the difference between the actual position Trimed found itself in after the breach and the position it would have been in if Sherwood had complied with its contractual obligations for six months and not engaged in any of the unlawful acts alleged in Trimed's complaint, including those acts alleged under the trade slander count. However, the conduct that Trimed alleged as trade slander, while not constituting slander as a matter of law, was also alleged under tortious unfair competition. *See* Am.Compl. 13 (J.A. at 25). Therefore, any injury resulting specifically from this conduct could have been properly compensated under Count III.

## VI.

Sherwood finally raises two challenges to the jury's punitive damages award. The jury awarded Trimed over three million dollars in punitive damages but did not specify whether the award was for both tort counts (I and III) or only one. Sherwood first contends that if we overturn the jury verdict on either Count I or III, the punitive damage award cannot stand. Since we have upheld the verdicts on both counts, Sherwood's claim in this regard fails.

■ Sherwood also challenges the court's formulation of instructions on punitive damages, which we review merely for abuse of discretion. It argues that the court erred in refusing to instruct the jury that in order to award punitive damages, it must find that Sherwood's "sole purpose" was to injure Trimed. The court instructed the jury as follows:

> If you find that Sherwood deliberately and wilfully with malice interfered with Trimed's contractual relationships with its customers, that the interference was purposely done to injure Trimed, or that Sherwood deliberately and wilfully with malice unfairly competed with Trimed, purposely to injure Trimed, then you may award punitive damages in addition to the compensatory damages I have referred to earlier.

Jury Charge 45 (J.A. at 1562).

We first note that Maryland courts have never invoked a "sole-purpose" requirement, and the court's instructions were without error in law. *See Owens Illinois v. Zenobia*, 325 Md. 420, 601 A.2d 633, 650 (1992) ("punitive damages are awarded in an attempt to punish a defendant whose conduct is *characterized by* evil motive. . . ." (emphasis added)); *First National Bank v. Shpritz*, 63 Md.App. 623, 493 A.2d 410, 420 (Md.Ct.Spec.App.) (actual malice is "characterized as the performance of an act . . . with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff"), *cert. denied*, 304 Md. 297, 498 A.2d 1184 (1985). Given the law and the court's plenary instruction, we find no abuse of discretion.

## CONCLUSION

The jury in this case returned a verdict and awarded damages against Sherwood after a four-week trial including the testimony of over thirty witnesses. Our role on appeal does not extend to revisiting and assessing the labyrinth of evidence presented in such a case. We have reviewed the law of the case, certain rulings of the district court, and the findings of the jury, and find no erroneous or insupportable decisions. Accordingly, we affirm the verdict and awards below.

AFFIRMED.