56 F.3d 62
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 Leon Ray SOLESBEE, Jr., Plaintiff-Appellee,
v.
Richard WITKOWSKI, Warden; Brad Basic; John Mills; Sue
Mills; Matthew Ogunsile, Defendants-Appellants,
and
Jimmy Sewell, Supervisor, South Carolina Department of
Corrections; Mary Ann Sanders; Larry Arrowood; Benjamin
Hunter; Vernon Miller; Larry Keller; Jeff Henderson;
Lillian Westfield; Jimmy Brown, Defendants.
 No. 94-6916.
 United States Court of Appeals, Fourth Circuit.
 Argued: March 8, 1995.
Decided: May 31, 1995.
 
 ARGUED: W. Howard Boyd, Jr., GIBBES & CLARKSON, P.A., Greenville, SC, for Appellants. John Christopher Mills, FAIREY, PROSISE & MILLS, P.A., Columbia, SC, for Appellee.
 ON BRIEF: Ronald Keith Wray, II, GIBBES & CLARKSON, P.A., Greenville, SC, for Appellants. W. Gaston Fairey, Rochelle L. Romosca, FAIREY, PROSISE & MILLS, P.A., Columbia, SC, for Appellee.
 Before HALL and MOTZ, Circuit Judges, and WILLIAMS, United States District Judge for the District of Maryland, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 The warden of a South Carolina prison and four correctional officers (COs) appeal the judgments against them in a civil rights action brought by an inmate who was injured by a fellow inmate. We affirm the judgments against the officers and reverse the judgment against the warden.
 
 
 2
 * Leon Ray Solesbee, Jr., was an inmate at South Carolina's Perry prison, one of the state's high-security institutions. On July 8, 1988, while sitting in the recreation area of Q-3 dormitory, he was attacked from behind by fellow inmate Mark Houston and stabbed three times with a homemade knife. At the time, COs Larry Keller, Sue Mills, Mary Ann Sanders and John Mills were on Q-3. COs Gordon Price and Matthew Ogunsile[1] were in the control room, a secure chamber with a view of the recreation room and the dormitory tiers.
 
 
 3
 As Solesbee tried to flee, Sanders threw a chair at the pursuing Houston and knocked him down. Solesbee slipped on his own blood and fell. Houston attacked again, and Sanders threw another chair. Keller, who had arrived in time to witness the second attack, came to within ten feet of the inmates and ordered Houston to stop. Solesbee was able to extricate himself from this second attack and headed outside. Keller pursued both inmates into the yard. Sanders was locked inside.[2]
 
 
 4
 CO Sue Mills, who had been performing a cell inventory with Keller, heard the commotion of the initial attack and followed Keller up the three steps to the recreation room. She stopped at the top of the steps and ran back to lock the cell at which she and Keller had been conducting an inventory. By the time she returned up the steps, the inmates were fleeing the room to the yard. She was locked inside with Sanders.
 
 
 5
 Outside in the yard, Houston caught Solesbee a third time and sat astride his victim, although the fervor of the assault had diminished somewhat, and Houston was only "poking" the knife rather than slashing. In addition to Keller, John Mills and Ogunsile had followed the inmate pair from Q-3. CO Brad Basic joined them from his post in the nearby mess hall. These four COs stood some ten feet from the inmates and yelled to Houston to cease the attack. Houston, however, ignored these commands and continued to stab Solesbee. After two to three minutes into the outside segment of the attack, Captain Sewell and four other COs came on the scene. When Houston saw them, he stood up, threw down his knife, and walked off into the crowd of inmates who had assembled in the yard. No one tried to apprehend him.
 
 
 6
 As Solesbee was being carried off on a stretcher, Houston suddenly charged, armed with another knife. The testimony conflicted about whether he knocked Solesbee off the stretcher or whether he was restrained before reaching the stretcher. In any event, he was finally restrained, handcuffed, and taken away.
 
 
 7
 All in all, Solesbee received 12-19 stab wounds. He was admitted to the hospital in critical condition, but he fully recovered and no longer receives treatment for any related problems.
 
 
 8
 Acting pro se,[3] Solesbee filed 42 U.S.C. Sec. 1983 actions against Sewell and Basic. These actions were consolidated, defendants were added, and summary judgment was granted to defendants on Solesbee's Fourteenth Amendment claims. After a jury trial, the magistrate judge granted judgment as a matter of law to seven defendants.[4] The jury returned a verdict in Sewell's favor, and Solesbee obtained verdicts against the five appellants for a total of $199,000.[5] The prison officials appealed.
 
 II
 
 9
 The Eighth Amendment proscribes the imposition of cruel and unusual punishment. The amendment imposes various duties on prison officials, among them the duty "to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 114 S.Ct. 1970, 1976 (1994) (internal quotation marks and citation omitted). Solesbee recovered on the theory that the appellants failed to protect him. The appellants counter that the evidence was insufficient to sustain the jury's finding of a constitutional violation.
 
 
 10
 An Eighth Amendment claim comprises both an objective and a subjective element. The objective prong entails a showing that the harm suffered is "sufficiently serious." Wilson v. Seiter, 501 U.S. 294, 298 (1991). The appellants concede that the injuries suffered by Solesbee at the hands of Houston met this requirement. The focus of this appeal is on the subjective element.
 
 
 11
 In the context of a claim that officials failed to protect an inmate, the Supreme Court has explained that liability must be premised on a finding of a "sufficiently culpable state of mind" on the part of the prison officials. Id. at 297. This subjective prong is satisfied by demonstrating that the prison officials were "deliberately indifferent" to the inmate's safety or health. Id. at 302-03. Proof of "deliberate indifference" requires a showing that prison officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed] ...," that the inference was actually drawn, and that the risk was nevertheless disregarded. Farmer, 114 S.Ct. at 1979. The risk of harm from Houston's ongoing attack was certainly clear to the CO appellants. The only issue is whether their responses constituted "disregard" of the risk such as would rise to a constitutional violation.
 
 III
 
 12
 "Farmer did not squarely address the question of a prison guard's duties or obligations toward an inmate." Gibbs v. Franklin, 49 F.3d 1206, 1208 (7th Cir.1995). Solesbee recovered on the theory that the individual COs should have taken more action than they did to abate the attack. The district court's instruction to the jury, to which no objection was made by the defendants, correctly summarizes the relevant law:
 
 
 13
 [P]risoners have an Eighth Amendment right to reasonable protection from violence by fellow inmates....[T]o establish a violation of that right, the plaintiff must show by a preponderance of the evidence that the defendants acted wantonly, obdurately, or with deliberate indifference to a pervasive risk of harm or a specific known risk of harm.... [I]f prison officials simply stand by and permit one inmate to attack another, without taking any steps to prevent or stop the attack, prison officials may be engaged in cruel and unusual punishment if their inaction is a result of wantonness, obduracy, or deliberate indifference to those rights.
 
 
 14
 We will not overturn a verdict if we find, viewing the evidence in the light most favorable to the prevailing party," any substantial evidence" to support the verdict. Evington v. Forbes, 742 F.2d 834, 835 (4th Cir.1984). A similar standard governs our review of the denial of a motion for judgment as a matter of law; if a reasonable jury could have reached the verdict, we will not disturb it. Trimed, Inc. v. Sherwood Medical Co., 977 F.2d 885 (4th Cir.1992). The denial of a motion for a new trial is reviewed for abuse of discretion and "is not reviewable except in the most exceptional circumstances." Poynter v. Ratliff, 874 F.2d 219, 223 (4th Cir.1989). We hold that the evidence was sufficient to support the verdicts against the individual COs and that a new trial is not warranted.
 
 
 15
 The COs argue that the evidence does not show the requisite level of disregard for Solesbee's safety because: (1) they were unaware that Houston posed a risk to Solesbee prior to the attack; (2) they are not legally required to physically intervene if there is a danger of harm to themselves; and (3) the steps they did take were reasonable under the circumstances and consistent with their training. We will address each argument in turn.
 
 
 16
 Citing Farmer and Ruefly v. Landon, 825 F.2d 792 (4th Cir.1987), the COs contend that they cannot be held liable for the attack because there was nothing to suggest beforehand that Houston posed a risk to Solesbee. This argument misconstrues Solesbee's theory of liability. Nothing prior to the onset of Houston's attack is relevant to his claim against the COs. The liability of each CO proceeds from a point no earlier than that at which each became aware of the situation. As the attack ranged from the recreation room to the yard, the risk of further harm was substantial up through the point at which Houston was finally subdued.
 
 
 17
 Relying on Arnold v. Jones, 891 F.2d 1370 (8th Cir.1989), the COs contend that there is no Eighth Amendment duty to physically intervene in an inmate-on-inmate attack if there is a danger of incurring injury to themselves.[6] They argue that once they became aware of the attack, they "took action to intervene and as a result of their actions the attack stopped," these "actions" being the issuance of "repeated[ ] verbal commands" and a show of force.[7] A reasonable response to a known risk is sufficient to escape liability even if the harm is not averted. See Farmer, 114 S.Ct. at 1982-83; see also MacKay v. Farnsworth, 48 F.3d 491 (10th Cir.1995) (affirming summary judgment for COs who failed to physically intervene but who called for additional staff and medical personnel and who were preparing to intervene once sufficient staff were available). A reasonable response would preclude a finding of deliberate indifference.
 
 
 18
 The facts supporting this "reasonableness" argument are that the COs were not trained on how to intervene in inmate knife fights, that they are instructed not to jeopardize their own safety, and that physical intervention on their part posed a danger of inciting the other inmates in the yard. Nevertheless, if there is some substantial evidence that the responses were not reasonable, the argument fails.
 
 
 19
 Sue Mills testified that she returned to lock the cell where she and Keller had been conducting an inventory because she was concerned for the cell's resident's property. She also said that she thought she might get in the way had she gotten involved in the situation in the recreation room. In other words, after becoming aware of the attack, she made no response aimed at protecting Solesbee.
 
 
 20
 The verbal commands issued by Keller and appellants Basic, Ogunsile and John Mills had no apparent effect. These four trained COs stood only feet from the fracas and watched for up to three minutes as the attack continued. None called for back-ups, and none tried to retrieve anything to knock Houston off his prone victim. Basic, who had had some sixteen hours of training on the use of the PR-24 baton, failed to employ the baton in any manner. It was only when Captain Sewell and other COs arrived that the attack ceased.
 
 
 21
 With regard to the purported policy of non-intervention, there was evidence from various corrections officials to the general effect that the CO appellants followed departmental policy. Arrayed against this evidence was testimony from COs that they would probably have done more. Keller, for instance, who had been on the job two weeks at the time of Houston's attack, said he had since broken up fights at danger to himself. CO Larry Arrowood, who witnessed the outside segment of the attack, said that he probably would have tried to gain control of Houston. Sanders threw two chairs at Houston. The CO appellants presented no evidence that they took any action beyond issuing verbal commands.
 
 
 22
 There was conflicting evidence about the mood and the size of the crowd. Estimates of the size of the crowd of onlooking inmates ranged from 20-50 (Solesbee) to 400 (Basic). Ogunsile and Basic each testified that he neither heard threats from the inmates nor ever felt threatened. Inmates carried Solesbee on the stretcher, and CO Arrowood's written account of the incident noted that inmates, not COs, restrained Houston after his final attack.
 
 
 23
 The evidence of the lack of training, the prison policy of nonintervention, and the crowd is not so clear as to overcome the evidence that the CO appellants' responses were not reasonable ones. Moreover, the evidence of the disregard of Solesbee's safety is sufficient to support the pivotal finding that the COs were "deliberately indifferent," and we do not hesitate in upholding the verdicts against them. Other courts of appeal have affirmed damage judgments against COs who failed to take action to protect an inmate under similar circumstances. See Ayala Serrano v. Gonzalez, 909 F.2d 8 (1st Cir.1990) (upholding judgment against COs who failed to intervene in knife attack on inmate); Walker v. Norris, 917 F.2d 1449 (6th Cir.1990) (same).
 
 
 24
 The COs' claim of qualified immunity fails as well. The general duty of prison officials to protect inmates committed to their care had been clearly established for years prior to the attack on Solesbee. See Farmer, 114 S.Ct. at 1976-77 (tracing history of principle that inmates entitled to reasonable protection from harm at the hands of fellow inmates). Although we have never held that a CO must risk his own safety, we have held that this general duty to protect includes the more specific duty to intervene in some manner in inmate-on-inmate attacks. See Gordon v. Leeke, 574 F.2d 1147, 1152 (4th Cir.1978) (allegation that COs failed to intervene in knife attack stated cause of action for Eighth Amendment violation); Davis v. Zahradnick, 600 F.2d 458 (4th Cir.1979) (same). The case was properly submitted to the jury, and the verdicts are sustainable.
 
 IV
 
 25
 The theory of the warden's liability proceeded from a different premise than that of the COs.[8] Solesbee alleged that the warden knew of the pervasive risk of harm in the high risk Q-3 dorm where the attack began, that he failed to reasonably respond, and that he was thus deliberately indifferent to such safety concerns. The instructions to the jury sums up the theory:
 
 
 26
 Warden Witkowski ... may be held liable only if ... [he] tacitly approved of the acts of subordinates which were in violation of the plaintiff's constitutional rights or if [he] failed, as a result of deliberate indifference, to correct the acts of subordinates which were in violation of the plaintiff's constitutional rights.
 
 
 27
 Solesbee failed to present an adequate evidentiary basis for the imposition of liability on the warden.
 
 
 28
 The essence of Solesbee's claim is that the warden understaffed high-security dorms in violation of a standing consent decree in a prison-conditions case and that he hid this action from his superiors. Of course there was a risk of harm in Q-3, where the worst of the worst--the "alpha," or aggressive, inmates--were housed. Solesbee presented evidence that the consent decree required three COs in each dormitory, one in each wing and one in the control room. However, although only two COs (Price and Sanders) were assigned to Q-3, there were actually more officers in Q-3 at the time of the attack than were required by the consent decree.[9] Therefore, any failure to have a CO stationed in each wing could not be the proximate cause of Solesbee's injuries.
 
 
 29
 The evidence was undisputed that the warden was not responsible for the training his COs received; he took the officers that were assigned to Perry. Moreover, he had been on the job at Perry for less than two months prior to the attack. We are simply unable to conclude that lack of training could be laid at Warden Witkowski's feet or that the staffing pattern contributed in any way to Solesbee's injuries. Cf. Moore v. Winebrenner, 927 F.2d 1312 (4th Cir.) (noting lack of funding and warden's lack of authority to hire additional COs as factors supporting summary judgment in warden's favor), cert. denied, 502 U.S. 828 (1991). Accordingly, we reverse the judgment against the warden.
 
 AFFIRMED IN PART AND REVERSED IN PART
 
 
 [1]
 On the day of the attack, John Mills and Ogunsile were acting as, respectively, inmate relations coordinator and classification caseworker. Both, however, were certified correctional officers whose duties included security
 
 
 [2]
 As was standard practice, CO Price locked the doors from the control room to prevent other inmates from getting into the yard
 
 
 [3]
 Solesbee retained a lawyer after the trial
 
 
 [4]
 COs Sanders, Keller, Henderson, Arrowood, Hunter, Brown and Miller
 
 
 [5]
 The verdicts were as follows: (1) against Warden Witkowski, $40,000 compensatory and $40,000 punitive damages; (2) against Basic, Ogunsile, and John Mills, $16,500 compensatory and $16,500 punitive damages each; and (3) against Sue Mills, $10,000 compensatory and $10,000 punitive damages
 
 
 [6]
 Arnold held that the COs had qualified immunity because at the time of the attack in that case (1985), there was no clearly established Eighth Amendment right on the inmate's part to have COs endanger themselves to protect the inmate. If Arnold, standing alone, can be said to stand for the proposition that practically every failure to physically intervene is not actionable, the Eighth Circuit has since retreated from this view. Five years after Arnold, the Eighth Circuit explained that "[a] prison official acts with deliberate indifference to an inmate's safety when the official is present at the time of an assault and fails to intervene or otherwise act to end the assault." Williams v. Mueller, 13 F.3d 1214, 1216 (8th Cir.1994). Arnold was cited in Williams for the following proposition: "unarmed guards' failure to intervene does not constitute Eighth Amendment violation when there is evidence that intervention might result in serious injury or escalate the situation." Id
 
 
 [7]
 Appellants' opening brief at 19
 
 
 [8]
 Inasmuch as he was sued in his personal capacity only, the warden could not be held liable as a stand-in for the state or the department of corrections
 
 
 [9]
 Keller and Sue Mills, for instance, were not stationed on the Q-3 but were present conducting a cell inventory