<u>**UNPUBLISHED**</u>

**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

**No. 12-1649**

PAGIDIPATI ENTERPRISES, INC.,

Plaintiff – Appellee,

v.

LABORATORY CORPORATION OF AMERICA HOLDINGS,

Defendant – Appellant.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. N. Carlton Tilley, Jr., Senior District Judge. (1:10-cv-00742-NCT-LPA)

Argued: March 21, 2013        Decided: April 11, 2013

Before MOTZ and DUNCAN, Circuit Judges, and Robert E. PAYNE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by unpublished opinion. Judge Duncan wrote the opinion, in which Judge Motz and Senior Judge Payne joined.

**ARGUED:** Robert Steiner, KELLEY DRYE & WARREN, LLP, New York, New York, for Appellant. Reid Lloyd Phillips, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, Greensboro, North Carolina, for Appellee. **ON BRIEF:** Adam H. Charnes, Chad D. Hansen, KILPATRICK TOWNSEND & STOCKTON LLP, Winston-Salem, North Carolina, for Appellant. Joseph A. Ponzi, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, Greensboro, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

In this breach of contract action, Appellee Pagidipati Enterprises ("PEI") sued Appellant Laboratory Corporation of America ("LabCorp") to recover payments due under their Asset Purchase Agreement ("APA"). LabCorp asserted mutual mistake as an affirmative defense, arguing that the APA as written does not provide for compensation for growth attributable only to customers PEI brought to the deal, which is what the parties intended it to reflect. Finding that LabCorp's omission of some of its own prior customers from the APA did not constitute a mutual mistake under North Carolina law, the district court granted PEI's motion for summary judgment. For the reasons that follow, we affirm.

I.

A.

In late 2007, LabCorp, a New York corporation that operates a nationwide medical laboratory network, became interested in purchasing PEI, a family-owned Florida corporation then operating clinical laboratories and testing centers in seventeen Florida counties. The parties began negotiations. About a year later PEI agreed to sell its assets, including its customer list, to LabCorp for an initial purchase price of $13 million, as well as two Earnout Period Payments that PEI would receive if

3

certain conditions were met.  This agreement was finalized in a 31-page contract--the APA.

The contested provisions of the APA are Section 2.3, entitled "Earnout Amount," and the accompanying Exhibit 2.3(a), which lists "Shared Customers."  See J.A. 44-45, 91.  Section 2.3 sets out the time period and formula for calculating the two Earnout Period Payments.  These Payments are based on (1) a Revenue Minimum Target Amount ("RMTA"), which the parties set at $4,901,214, reflective of PEI's 2007 revenue; (2) a Revenue Multiplier, set at 2.1; and (3) "Revenues" for the first and second years following the APA, defined as LabCorp's revenues "for any and all services provided and billed to any customer listed on [PEI's] Customer List," as well a percentage of revenues for services provided to their shared customers.  Id. at 44.  Section 2.3 further defines "shared customers" as "those customers listed on Exhibit 2.3(a), which include certain customers . . . who were customers of both Seller and Purchaser during the period from January 1, 2007 through and including September 30, 2007."  Id.[1]  For each customer on the Shared

---

[1] For the First Earnout Period (Year One), PEI was to obtain a payout equal to (Year One Revenues – $4,901,214) x 2.1, not to exceed $2 million.  The Second Earnout Period operated in a similar way, such that the payout equals ((Year Two Revenues – $4,901,214) x 2.1) – First Earnout Period Payment, with the combined payouts for years one and two not to exceed $4 million. See id.

Customer List at Exhibit 2.3, PEI would only earn "partial credit" for increased revenues, which the parties intended to be "based on the historical percentage of business each company generated from those shared clients." Appellant's Br. at 13; see also J.A. 91.

The Shared Customer List was the product of negotiation between the parties. LabCorp initially drafted the list because it was unwilling to disclose its entire customer database to PEI. PEI never had access to LabCorp's customer database, receiving only the list of shared customers created by LabCorp.

Notably, the parties agree that not all shared customers merited placement on the final list. For example, because PEI began referring certain customers to LabCorp before closing, PEI negotiated with LabCorp to omit those customers from the Shared Customer List. Thus, it is undisputed that the Shared Customer List attached to the APA was intentionally underinclusive, and does not, nor was it ever meant to, "accurately" include all customers shared between LabCorp and PEI.

It is also undisputed that, under the APA as written, PEI is entitled to the full $4 million Earnout Amount. LabCorp nonetheless argues that the APA should not be enforced as written, and has refused to pay.

PEI filed this breach of contract action under North Carolina law in the Middle District of North Carolina, asserting federal jurisdiction based on diversity of citizenship. LabCorp answered, defending its failure to pay any Earnout Payment to PEI on grounds of mutual mistake. Specifically, LabCorp argued that its own failure to correctly identify all customers shared between the parties resulted in a Shared Customer List that did not effectuate the parties' mutual intent to reward growth attributable to customers PEI brought to the deal. LabCorp sought reformation of the Shared Customer List attached as Exhibit 2.3(a) to the APA. PEI moved for summary judgment.

The district court adopted the magistrate judge's report and recommendation, which rejected LabCorp's affirmative defense of mutual mistake. The court reasoned that LabCorp had failed to proffer any evidence that the parties had agreed to include any specific customers on the Shared Customer List that did not appear on the final list. Instead, "Defendant seeks reformation based on the prospect that a fact-finder might conclude that Plaintiff would have accepted an Exhibit 2.3(a) to the APA that included on the list of 'Shared Customers' the additional customers now belatedly identified by Defendant." J.A. 999. The court determined that LabCorp's asserted mistake did not fall within the scope of North Carolina's mutual mistake

6

doctrine, under which "a meeting of the minds as to the specific terms" is required, and the "general intent" of the parties to achieve some objective that the contract as written fails to achieve will not suffice. See id. at 1000 (emphasis omitted).

Accordingly, the district court entered summary judgment in PEI's favor, awarding over $4.5 million for the full Earnout Period Payments plus pre-judgment interest and costs. LabCorp timely appealed.

II.

As it did below, LabCorp asks this court to rewrite the Shared Customer List to add customers that currently appear on PEI's Customer List but were apparently also shared by LabCorp, so as to reduce PEI's Earnout Amount to zero. This reformation is warranted, LabCorp argues, because the Shared Customer List does not accurately reflect the parties' intent to account for growth attributable only to PEI's customers. Thus, the Shared Customer List drafted and agreed to by the parties constitutes a mutual mistake, and the district court erred in construing North Carolina law too narrowly. We disagree.

LabCorp's argument fails for at least three reasons: (1) the "meeting of the minds" that LabCorp alleges the APA fails to embody is far more general than the mistake it asserts, and the reformation it seeks; (2) any mistake relating to the contents

7

of the Shared Customer List was not mutual, but rather LabCorp's singular failure; and (3) even if it were warranted, LabCorp's inability to identify a mutual mistake with any specificity also prevents the court's reformation of the Shared Customer List. We address each of these reasons in turn. In doing so, we review the district court's grant of summary judgment de novo, viewing all facts and drawing all reasonable inferences in LabCorp's favor. See Webster v. U.S. Dep't of Agric., 685 F.3d 411, 421 (4th Cir. 2012). We also review de novo the district court's interpretation of North Carolina contract law in a diversity case such as this one. See Trimed, Inc. v. Sherwood Med. Co., 977 F.2d 885, 888 (4th Cir. 1992).

## A. A mutual mistake must be specific.

We agree with the district court that LabCorp has failed to meet its burden of proof under North Carolina's mutual mistake doctrine to show by clear, cogent and convincing evidence that some material part of the agreement was inadvertently omitted. Although the Shared Customer List may constitute a "mistake" insofar as the Earnout Amount under the APA does not, in LabCorp's present estimation, effectuate the parties' general intent for the payments to compensate PEI for growth

attributable to PEI's customers, that cannot justify the court's intervention into their drafting failure.[2]

A mutual mistake is a mistake that is "'common to both parties to a contract . . . wherein each labors under the same misconception respecting a material fact, the terms of the agreement, or the provisions of the written instrument designed to embody such agreement.'" Branch Banking & Trust Co. v. Chicago Title Ins. Co., 714 S.E.2d 514, 518 (N.C. App. 2011) ("BB&T") (quoting Metro. Prop. & Cas. Ins. Co. v. Dillard, 487 S.E.2d 157, 159 (N.C. App. 1997)). We apply a "'strong presumption in favor of the correctness of the instrument as written and executed, for it must be assumed that the parties knew what they agreed and have chosen fit and proper words to

---

[2] LabCorp cites the following evidence to prove the inaccuracy of the Shared Customer List: (1) the declaration of LabCorp's Director Greg Klenke, who states that the Shared Customer List is "not accurate," that it "omits many long-standing clients of LabCorp," and that these are "customers LabCorp had before the [PEI] transaction," J.A. 979–80; and (2) the declaration of LabCorp's Senior Vice President Robert Nelson, who states: "Providing [PEI] with earn out credit for LabCorp's own customers is contrary to the intention of the parties, reflected, among other things, in the form of the transaction that contemplated the sale of a customer list as well as the obligation placed on the sellers post-closing to assist with the smooth transition of [PEI's] customers to LabCorp in the hope that such a transition would lead to a growth in the business attributable to those customers," J.A. 1020. Like LabCorp's argument, its evidence skips a step. As we discuss further, it does not necessarily follow from the fact that the Shared Customer List omits some customers of LabCorp that the Shared Customer List is "not accurate."

express that agreement in its entirety.'" Hice v. Hi-Mil, Inc., 273 S.E.2d 268, 270 (N.C. 1981) (quoting Clements v. Life Ins. Co. of Va., 70 S.E. 1076, 1077 (N.C. 1911)).

However, as in BB&T, LabCorp "does not allege that it had an oral agreement with [PEI] that was mistakenly omitted from the [APA]." 714 S.E.2d at 518. Instead, LabCorp argues "that a mutual mistake by both it and [PEI] led to [an] 'inadvertent windfall'" of sorts because neither party ever intended that the Earnout Amount would exceed growth attributable to PEI's customers. See id. But BB&T makes clear that more is required for reformation of a contract. LabCorp must "show that it and [PEI] had a meeting of the minds as to the specific terms of the [Shared Customer List], and that some material part of their agreement was mistakenly omitted from the [Shared Customer List]." Id. at 519. LabCorp has not presented any evidence that it and PEI had a mutual intention to include certain customers on the Shared Customer List so that it would adequately reflect growth, and that the Shared Customer List, as a result of a mutual mistake, failed to properly express those intentions.

LabCorp cites a legal treatise in support of a more lenient burden it would have us apply here. In a generic summary of the law, that treatise teaches: "To establish a mutual mistake in an instrument so as to authorize its reformation . . . it is

10

sufficient to show that [the parties] agreed to accomplish a particular object by the instrument to be executed and that such instrument, as executed, is insufficient to effectuate their intention." 66 Am. Jur. 2d Reformation of Instruments § 22. Although that language is admittedly broader than the language from BB&T upon which the district court relied, this treatise does not supply the North Carolina law we are bound to apply in this case.

Nor do we find that LabCorp has met even the lesser burden it presses upon us. Although LabCorp's evidence does tend to show that the purpose of the Earnout Period Payments was to reward PEI for additional growth attributable to PEI's customers beyond that anticipated at the time of the sale,[3] none of the evidence shows that the Shared Customer List does not accomplish that objective--at least to the extent that objective was mutual. On the basis of this evidence, we cannot conclude that LabCorp has shown the APA insufficiently effectuates the

[3] To prove the parties' mutual intent, LabCorp also supplies, in addition to the Klenke and Nelson declarations already discussed, supra note 2, (1) documentary evidence concerning the negotiation and drafting of the APA, including emails between the parties, and a memorandum written by PEI; and (2) the deposition testimony of several of PEI's shareholders and officers, generally supporting the notion that the purpose of the Earnout Payments was to provide PEI additional compensation if its customers produced increasing profits. See Appellant's Br. at 3.

11

parties' mutual intent, so as to authorize its reformation, even under its proposed formulation of the rule.

None of the North Carolina precedent LabCorp cites in support of its argument requires a contrary conclusion. For example, in Dettor v. BHI Prop. Co. No. 101, 379 S.E.2d 851, 853 (N.C. 1989), the North Carolina Supreme Court reversed the district court's grant of partial summary judgment, ruling that a triable issue of fact remained as to whether the parties to a land sale had a mutual understanding that a creek running near a ten-acre tract of land would provide the southern boundary, or whether the specific acreage listed in the agreement was intended to control. That holding has no bearing on our present inquiry, because there is no question of fact as to whether LabCorp and PEI intended the Customer Lists attached to the APA to control, or "provide the boundary for," the Earnout Amount. At the time they entered into the APA, both parties agreed to the Shared Customer List as the proper means of calculating growth attributable to any shared customers for the purpose of determining the Earnout Payments.

Indeed, as it must, LabCorp concedes that this was the parties' mutual intent. Nonetheless, it now seeks to move a few names from PEI's Customer List to the Shared Customer List without providing any evidence whatsoever that the parties intended or agreed to do so. There is no mutual mistake to be

12

found on these facts, merely an apparent lack of diligence by LabCorp. The court can provide no remedy for that mistake, which is the result LabCorp negotiated and agreed to.

B. <u>Any mistake was unilateral, not mutual.</u>

It follows that the mistake upon which LabCorp seeks to rely is solely its own. "The mistake of one party . . . alone, not induced by the fraud of the other, affords no ground for relief by reformation." <u>Matthews v. Shamrock Van Lines, Inc.</u>, 142 S.E.2d 665, 668 (N.C. 1965) (internal quotation marks omitted). Here, full responsibility for comparison of the parties' existing customer lists rested with LabCorp, because LabCorp was unwilling to disclose all of its customers to PEI. PEI never had access to LabCorp's secret customer database, which is what LabCorp used to draft the Shared Customer List. LabCorp's assertion that the "mistake" here was mutual consequently strains credulity, in addition to failing to meet the clear requirements of North Carolina contract law.

C. <u>Lack of specificity renders reformation impossible.</u>

Finally, even if LabCorp were able to obtain reformation to fix its own mistake, it cannot simply point to a customer on PEI's Customer List and argue that the parties intended to include that customer on the Shared Customer List for the sole reason that it had also been a customer of LabCorp. As we have already discussed, the Shared Customer List was not an

13

exhaustive list of all shared customers. In light of that fact, LabCorp's failure to identify with particularity the circumstances constituting its mistake--beyond its amorphous, unsupported assertion that some customers from PEI's Customer List should have been added to the Shared Customer List--or to proffer any evidence from which it could be determined that the parties intended to include any specific omitted customers, renders the reformation task LabCorp asks us to perform impossible. It also underscores the flaws in LabCorp's mutual mistake theory as a whole.

"'Reformation is a well-established equitable remedy used to reframe written instruments where, through mutual mistake or the unilateral mistake of one party induced by the fraud of another, the written instrument fails to embody the parties' actual, original agreement.'" BB&T, 714 S.E.2d at 517-18 (quoting Metro. Prop. & Cas., 487 S.E.2d at 159). To qualify, LabCorp must state "with particularity the circumstances constituting mistake as to all of the parties to the written instrument." Best v. Ford Motor Co., 557 S.E.2d 163, 166 (N.C. App. 2001).

Here, the undisputed evidence shows that the parties negotiated extensively to arrive at the final list of shared customers that is embodied in the Shared Customer List attached to the APA. According to its stated terms, the Shared Customer

14

List comprises only "<u>certain</u> customers . . . who were customers of both [PEI] and [LabCorp] during the period from January 1, 2007 through and including September 30, 2007." J.A. 44 at 2.3(a) (emphasis added).

Because the Shared Customer List was never intended to be inclusive of all customers shared between the parties, at the bare minimum LabCorp would need to show <u>something</u> to prove the parties intended that each omitted customer be reflected as shared in the APA. Given LabCorp's lack of evidence, we cannot discern any method for determining which "certain" customers we might add to a reformed Shared Customer List in order to effectuate the parties' mutual agreement. LabCorp's unsupported assertion that the Earnout Amount as currently calculated under the APA does not "accurately" account for growth attributable to PEI's customers falls far short of providing such a method. It is similarly unclear how LabCorp would have us allocate the percentage of revenues to each omitted customer in reforming the Shared Customer List.[4] From a practical standpoint then, we fail to see how the APA possibly could be refashioned based on LabCorp's proffered evidence, even if reformation were legally warranted, which it is not.

---

[4] Also noticeably absent is any justification or explanation by LabCorp for this "mutual" mistake.

15

Accordingly, we agree with the district court that LabCorp's performance under the APA's provision for PEI's Earnout Amount, which embodies the parties' actual, original, fully-negotiated, specific agreement, is not excused by any mutual mistake. The doctrine of mutual mistake cannot be intended for use by a party seeking to rewrite a contract in order to obtain some benefit of a bargain better than the one it negotiated for itself, merely because it mistakenly thought it was getting a better deal.

## III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.